[Cite as *Bennett v. Biernacki*, 2022-Ohio-4449.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| PAMELA BENNETT, et al., | : | CASE NO. CA2022-05-030 |
| Appellants, | : | O P I N I O N<br>12/12/2022 |
| | : | |
| - vs - | : | |
| | : | |
| IAN BIERNACKI, et al., | : | |
| Appellees. | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CV093759

Robbins, Kelly, Patterson & Tucker, LPA, and Cory D. Britt, for appellants.

David P. Bolek, for appellees.

**M. POWELL, P.J.**

{¶ 1} Pamela Bennett and her husband Scott Bennett appeal the decision of the Warren County Court of Common Pleas granting summary judgment in their negligence action against Ian Biernacki and Fitness Gurus, LLC, d/b/a Crunch Fitness. Because a genuine issue of material fact exists, summary judgment is inappropriate. Therefore, we reverse.

## I. Facts and Procedural History

{¶ 2}   In May 2018, Pamela Bennett became a member of Crunch Fitness.  She had never been a member of a gym before and had no experience with exercise equipment.  So Bennett[1] also purchased the services of a personal trainer from the gym.  She was assigned Biernacki, whom the gym had hired a few days before.  Although Biernacki was not certified as a personal trainer and had never worked as a personal trainer, he did have certification as a strength-conditioning coach and had certification related to Olympic weightlifting.  Bennett signed a membership agreement and a personal-trainer agreement, and in each she agreed that she would not hold the gym or its employees liable for any injury that she sustained except for injury that resulted from "willful misconduct" or "gross negligence."

{¶ 3}   In November 2018, Bennett had her second exercise session with Biernacki.  One of the exercises that he had for her was a "row up."  This exercise used a power rack, which is a steel cage-like structure with four vertical posts that is used for barbell exercises.  Attached to the power rack are "J-cups," on which a barbell sits.  In a row-up exercise, J-cups holding an unweighted barbell are placed on the outside of the power rack, and the exerciser stands inside the rack.  The exerciser grasps the barbell, leans back, and performs what might be best described as a reverse pushup.  When done from inside the power rack, the vertical bars prevent the barbell from being pulled off the J-cups.  This was the first time that Bennett had ever done this exercise or used a power rack.  Biernacki stood inside the rack and demonstrated the exercise while Bennett stood outside the rack and watched him.  When he finished, he told her to "step in."  Biernacki walked about three feet to the side of the power rack where he had left his exercise notes on the floor to check how many repetitions and sets Bennett should do.  He thought that she would wait for him

---

1 "Bennett" in this opinion refers to Pamela Bennett unless otherwise noted.

to tell her to begin the exercise. She did not. While he was looking away, Bennett stepped up to the rack, and having not understood the importance of performing the exercise from inside the rack, she grasped the barbell from the outside. When Bennett leaned back, the barbell slipped off the J-cups, and she fell onto the floor. The fall resulted in a compression fracture of one of her vertebrae that required multiple surgeries, including a lumbar fusion.

{¶ 4} The Bennetts filed a negligence action in November 2020 against Biernacki and Crunch Fitness asserting two claims of negligence along with a derivative claim for loss of consortium. They later filed an amended complaint that added a claim for willful, wanton, and reckless conduct. Biernacki and the gym moved for summary judgment, arguing waiver and assumption of the risk.

{¶ 5} On April 13, 2022, the trial court granted the motion for summary judgment. The court concluded that in the membership agreement and the personal-trainer agreement Bennett had expressly assumed the risk of injury and had waived her right to seek damages. The court determined that Biernacki did not commit wanton misconduct nor was he grossly negligent. The court further concluded that Bennett's claims were barred by primary assumption of the risk involved in weightlifting. Instead, the trial court found that Biernacki had instructed Bennett on the proper way to perform the exercise, that she did not perform the exercise as he instructed, and that she began the exercise without being instructed to do so.

{¶ 6} The Bennetts appealed.

## II. Analysis

{¶ 7} The sole assignment of error alleges:

{¶ 8} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEES FITNESS GURUS, LLC D/B/A CRUNCH FITNESS AND IAN BIERNACKI.

{¶ 9} Summary judgment is appropriate when "the evidence, properly submitted, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87, ¶ 11; Civ.R. 56(C). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505.

{¶ 10} Here, to recover for negligence, Bennett must prove (1) that Biernacki owed her a duty of care, (2) that he breached his duty, and (3) that the breach caused her injury. *See Winkle v. Zettler Funeral Homes, Inc.*, 182 Ohio App.3d 195, 2009-Ohio-1724, ¶ 46 (12th Dist.).

A. *Biernacki's duty of care*

{¶ 11} "'The existence of a duty is fundamental to establishing actionable negligence, without which there is no legal liability.'" *Uhl v. Thomas*, 12th Dist. Butler No. CA2008-06-131, 2009-Ohio-196, ¶ 10, quoting *Adelman v. Timman*, 117 Ohio App.3d 544, 549 (8th Dist.1997). Liability for negligence arises when a defendant owes a plaintiff a duty of care and fails to take reasonable measures to prevent injury that is reasonably foreseeable from the defendant's conduct. The duty-of-care determination is a question of law for courts to decide. *See Winkle* at ¶ 47; *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

{¶ 12} Assumption of risk is a measure of the defendant's duty of care. *See Pryce v. Town Sports International, LLC*, S.D.N.Y. No. 18 Civ. 5863, 2021 WL 1226926, *13 (Mar. 31, 2021). "Express assumption of risk * * * arise[s] where a person expressly contracts with another not to sue for any future injuries which may be caused by that person's negligence." *Anderson v. Ceccardi*, 6 Ohio St.3d 110, 114 (1983). It is "the same as

waiving the right to recover." (Citation omitted.) *Oliveri v. OsteoStrong*, 11th Dist. Lake No. 2019-L-104, 2021-Ohio-1694, ¶ 17. Where there is express assumption of risk, the defendant's duty to the plaintiff is to use due care not to increase the risks over and above those that the plaintiff expressly assumed.

{¶ 13} There is no real dispute here that Bennett expressly assumed risk. In the membership agreement and in the personal-trainer agreement that she signed, Bennett agreed to these two provisions:

> 2. MEMBER RISK. Member * * * shall hold FITNESS GURUS, LLC harmless from any loss, theft, cost, claim, injury, damage or liability ("Damages") incurred as a result of the use of a FITNESS GURUS, LLC facility and any other membership activities, except such Damages which result from the willful misconduct or gross negligence of FITNESS GURUS, LLC, its affiliates, agents or employees.
>
> * * *
>
> (2.5) Activity Risk. Any strenuous athletic or physical activity involves certain risks. Member * * * assume[s] the risk of any [and] all accidents or injuries of any kind that may be sustained by, or in connection with, use of the facilities and release, hold FITNESS GURUS, LLC harmless, discharge and absolve FITNESS GURUS, LLC, its agents and employees from any and all Damages or responsibility except if such accident or injury is the result of willful misconduct or gross negligence of FITNESS GURUS, LLC, its affiliates, agents or employees.

In short, Bennett expressly assumed all risk of injury except injury that resulted from "willful misconduct" or "gross negligence." She waived the right to recover damages for anything else.

{¶ 14} Thus Biernacki's duty of care to Bennett was not to cause her injury by his willful misconduct or gross negligence.

B. *Breach of the duty of care*

{¶ 15} Willful misconduct and gross negligence refer to different degrees of care. "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule

of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." (Citation omitted.) *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 32. Gross negligence is the "failure to exercise any or very slight care" or the "failure to exercise even that care which a careless person would use." *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 37 Ohio St.3d 259, 265 (1988); *Winkle*, 182 Ohio App.3d 195, 2009-Ohio-1724, at ¶ 46.

{¶ 16} Much of what happened in this case is not really disputed. The evidence shows that Biernacki explained and demonstrated to Bennett the proper way to perform the row-up exercise. Bennett's expert wrote in his report that "Mr. Biernacki explained and demonstrated the Row Up for Ms. Bennett using proper technique." And Biernacki testified that he showed her how to do it from inside the rack, telling her, "we have to pull this bar towards us." He further testified that he "even picked the bar up and pushed it against the rack to really drive home that image, we're pushing into it." Biernacki then told Bennett to "step in." Biernacki stepped to the side of the rack, roughly three feet away, and looked away from Bennett at his exercise notes. While he was looking away, Bennett stepped up to the rack and began performing the exercise from outside the power rack—contrary to how Biernacki had explained and demonstrated it. The barbell slipped off the J-cups, and Bennett fell. The evidence shows that it is unlikely that Bennett would have been injured if she had performed the exercise from inside the rack.

{¶ 17} Bennett's negligence argument focuses on the fact that Biernacki looked away from her. Had he been watching, she contends, he would have (presumably) ensured that she performed the exercise safely.

{¶ 18} Biernacki maintains that he did not know Bennett was performing the exercise, that he thought she was waiting for him to tell her to start. Biernacki's deposition

testimony suggests that his back was to her: "by the time I had turned around to look at her she was pretty much already falling back." His later testimony, though, suggests that perhaps his back was not fully to her: "It happened so fast. I saw a motion[.]" But Bennett testified at her deposition that Biernacki looked up from his notes and saw her: "So I did the exercise. And he looked up and saw that I was doing the exercise, didn't say a word, and I was on the opposite side[.]" She later testified again that when she grabbed the barbell (from the wrong side) she saw him looking at her—that his back was not turned to her, and that he looked up at her but did not say anything. Of course, if Biernacki was watching Bennett, he should have stopped her from performing the exercise incorrectly. And his failure to do so would likely constitute willful misconduct or gross negligence. But whether Biernacki committed willful misconduct or gross negligence by not watching Bennett depends on whether Bennett was justified in beginning the exercise without the go-ahead from Biernacki.

{¶ 19} As we said, Biernacki testified at his deposition that he did not know Bennett had begun the exercise because he thought that she would wait for him to tell her to begin. "Before I had given her any instruction to proceed with the exercise," Biernacki said, "she ha[d] already fallen." As he explained it, his job was to give "cues":

> [Y]ou know, it looks good. *You may begin*. Or let's have another rep. You know, something like that. * * * So I cue the individuals. This situation she did not give me an opportunity. She had already taken it into her own hands before I could even assess it.

(Emphasis added.). When Biernacki was asked whether, if he had been watching Bennett the whole time, he could have said something, Biernacki answered no:

> A. No, because I like to believe she would have had to *wait for me to allow her to begin the exercise* before I say anything. And that's when I reference the cues.
>
> Q. Okay. So you think that she did this just so quickly that there

was just no avoiding it?

> A. There was no avoiding it. Because what I would have liked to have seen is for her to step underneath the bar or around it, you know, get onto the right side of the bar and I go, hey, let's position our hands at this width, we're going to lean back at this angle and we're going to pull straight to our chest. None of that occurred because there was no time for that. And *that's typically how my training session will go*.

(Emphasis added.).

{¶ 20} But according to Bennett that is not how her training sessions with Biernacki had gone. Bennett testified at her deposition that Biernacki had never given her the go-ahead to begin an exercise:

> Q. * * * Would he give you instructions on when to start or stop or count or how many you were supposed to do or, you know, how did that work?
>
> A. He told me to do like ten but that was the only thing. He didn't give me any instructions on how to do it—
>
> * * *
>
> A. —*or when to do it*, where to do it. Just how many to do.

(Emphasis added.). If Bennett is believed, based on established practice, Biernacki had little reason to expect that she would wait for him to tell her to begin the row-up exercise. This would be especially true after he told her to "step-in."

{¶ 21} Thus a genuine issue of material fact remains in this case. Whether Bennett was justified in beginning the exercise without an explicit go-ahead from Biernacki is a disputed issue, as there is credible evidence on both sides. And the resolution of this factual issue is necessary to determine whether Biernacki breached his duty of care to Bennett by looking away from her. Evidence from Bennett's expert supports her contention that Biernacki's looking away rose to the level of willful misconduct or gross negligence.

{¶ 22} Ultimately, the resolution of the factual dispute here depends on credibility of

two parties in this case. *See Turner v. Turner*, 67 Ohio St.3d 337, 341 (1993) (stating that a credibility issue arises in summary-judgment proceedings "when one litigant's statement conflicts with another litigant's statement over a fact to be proved"). Determining the credibility of the evidence is "contrary to the purpose of Civ.R. 56(C)." *Id.* "Since resolution of the factual dispute will depend, at least in part, upon the credibility of the parties or their witnesses, summary judgment in such a case is inappropriate. * * * Such a discrepancy over a material fact can be resolved only by the trier of fact[.]" *Id.* (concluding on this basis that the trial court erred by granting defendant's motion for summary judgment).

### III. Conclusion

{¶ 23} "[A] trial court is required to overrule a motion for summary judgment where conflicting evidence exists and alternative reasonable inferences can be drawn." *McCarthy v. Lordstown*, 11th Dist. Trumbull No. 2014-T-0050, 2015-Ohio-955, ¶ 7, citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121 (1980); *see also Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 359 (1992). Here, whether Bennett was justified in beginning the exercise without an explicit go-ahead from Biernacki is a material issue of fact on which the evidence is in genuine dispute. A fact-finder could find that Bennett was so justified and conclude that, by looking away before he was sure that she was performing the exercise properly, Biernacki breached his duty of care to her. Therefore, the trial court erred by granting Biernacki and Crunch Fitness summary judgment. The sole assignment of error is sustained.

{¶ 24} The trial court's judgment is reversed. This case is remanded for further proceedings.

S. POWELL and HENDRICKSON, JJ., concur.