[Cite as *Meranda Nixon Estate Wine, L.L.C. v. Cherry Fork Farm Supply Co.*, 2024-Ohio-1523.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| MERANDA NIXON ESTATE WINE, LLC, et al., | : | |
| | : | CASE NO. CA2023-01-002 |
| Appellants, | : | O P I N I O N |
| | : | 4/22/2024 |
| - vs - | : | |
| | : | |
| CHERRY FORK FARM SUPPLY CO., et al., | : | |
| | : | |
| Appellees. | | |

CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. 2019-0272

Collins Roche Utley & Garner, and Richard M. Garner, for appellants.

Reminger Co., LPA, and Robert W. Hojnoski and Jennifer J. Jandes, for appellees.

**HENDRICKSON, J.**

{¶ 1} Plaintiffs-appellants, Seth Meranda and Maura Meranda ("the Merandas"), appeal the decision of the Brown County Court of Common Pleas granting summary judgment to defendants-appellees, Cherry Fork Farm Supply Co. ("Cherry Fork") and Kyle Martin, on the Merandas' claims for damages to their vineyard as a result of herbicide drift. For the reasons discussed below, we affirm in part, reverse in part, and remand for

further proceedings.

## I. FACTS

{¶ 2}    Seth owns a 49-acre farm in Ripley, Brown County, Ohio.  On the farm, Seth and his wife grow multiple varietals of grapes from which estate wines are made.  A portion of the wine yield is for the Merandas personal use and the remaining yield is sold through a winery business, the Meranda Nixon Estate Wine, LLC dba Meranda Nixon Winery ("the winery"), which is operated on the property and is owned by Seth and Maura.[1]

{¶ 3}    Grapes are grown in four different blocks on Seth's farm:  Blocks A, B, C, and D.  Block A, which is located on the southeastern portion of the property, is just over two acres in size and has Norton and Catawba grapes planted on it.  Blocks B and C are more centrally located on the property, with Block B being more northern than Block C.  Block B is approximately four acres in size and is used to grow Traminette, Chardonnay, and Cab Franc grapes.  On Block C, which is about six acres in size, Traminette, Cabernet Sauvignon, Chardonnay, and Norton grapes are grown.  Block D, which is approximately four acres in size, is located on the western portion of Seth's property.  Cabernet Sauvignon and Chardonnay grapes are grown in Block D.

{¶ 4}    Seth's farm is neighbored by other farmland.  To the north of his property is a farm owned by his brother, Jerome Meranda.  To the south is the Fussnecker farm.  Finally, to the west of Seth's farm, or "directly behind" Seth's farm, is the Bulow Farm.  In 2018, Seth had a crop-sharing agreement with Bulow that allowed him to farm Bulow's soybean field, which was located somewhat near the Block D grapevines.  Between the Bulow's soybean field and the Block D grapevines was a triangular shaped portion of

---

1. Meranda Nixon Estate Wine, LLC was a plaintiff in the underlying action.  It was dismissed as a party by the trial court following a motion made by appellees.  The winery's dismissal as a party is not challenged on appeal.

Seth's property. This triangular shaped property served as a buffer zone between the grapes in Block D and the Bulow soybean field. A map of Seth's property has been set forth below.



{¶ 5} On April 28, 2018, Seth contacted Cherry Fork,[2] with whom he had a longstanding business relationship, and requested herbicide applications for portions of his home farm and for the Bulow soybean field.[3] With respect to the Bulow soybean field, Seth requested a "complete burndown" of the field in order to prepare it for future crop planting. At the time Seth contacted Cherry Fork to request the burndown, it was later in the season than he normally requested herbicide application. In a typical year, Seth tries to get a field burnt down near the end of March or early April so that it is done in advance

---

2. Seth contacted Georgetown Farm Supply for the herbicide applications. Georgetown Farm Supply is a division of Cherry Fork Farm Supply Co. For clarity, all references to the herbicide application will be to Cherry Fork's application.

3. Seth had also requested an herbicide application to a third farm, the Dahlheimer Farm, which he sharecropped. The Dahlheimer Farm is not a neighboring farm to Seth's property. It was not sprayed until June 2018 and, by the appellees' own admission, "is irrelevant to [the Merandas'] claims."

of budbreak—when new growth emerges on the grapevines, which usually occurs around mid-April. Following budbreak, grapevines are more susceptible to herbicide drift or damage. Seth believed that 2018 was a "one-off year" in which budbreak did not occur until May.

{¶ 6} When Seth called Cherry Fork to request a burndown of the Bulow soybean field and herbicide application to portions of his home farm, he spoke with Cherry Fork's Office Manager, Michelle Meranda ("Michelle").[4] Michelle and Seth have conflicting memories of what occurred when they spoke on April 28, 2018. Michelle believes that Seth specifically requested that the following herbicides be used: Authority XL, Roundup PowerMax, and Weedar Amine (2,4-D). Seth, however, contends that when he spoke to Michelle on April 28, 2018, he merely requested spray of his farm and a burndown of the Bulow soybean field. Seth told Michelle what crops he intended to plant on the Bulow field once burndown was complete. While he requested that 2,4-D ester not be used, he denies that he asked for specific products to be sprayed, such as the Weedar Amine (2,4-D) or the Roundup PowerMax.

{¶ 7} Cherry Fork was unable to immediately spray the Bulow soybean field or Seth's home farm due to weather conditions and the need to fulfill spray orders from other customers. Seth repeatedly followed up with Cherry Fork to find out why the burndown and herbicide applications he had requested had not occurred.

{¶ 8} On May 10, 2018, Cherry Fork was able to begin the herbicide applications Seth requested. Michelle indicated that she spoke with Seth that morning by phone to ensure that he still wanted the Bulow soybean field and his farm sprayed. Seth advised Michelle that "it's getting late enough, I need it sprayed." Michelle could not recall if she

---

4. Michelle Meranda is Seth's sister-in-law by way of her marriage to Seth's brother, Jerome Meranda.

discussed the weather conditions with Seth that day.  She did recall, however, discussing the weather conditions with Kyle Martin, the Cherry Fork employee and licensed commercial applicator who had been sent to fulfill Seth's spray orders.  Michelle recalled that prior to Martin beginning the spray at the Bulow soybean field, he had called and expressed concern about the wind conditions.  She advised Martin that "Seth wanted it sprayed and he said it would be okay, it was late enough in the game, he really needed it burnt down."  Martin could not recall what conversations he had with Michelle on May 10, 2018 prior to starting his application at the Bulow soybean field.  However, he does not think he spoke to Michelle about wind conditions as he recalls that the wind "wasn't terrible" when he started the chemical application.

{¶ 9}  Martin has been a licensed commercial applicator for 20 years and has sprayed 12,000 to 14,000 acres per year during that time.  When he first started spraying, he used a handheld wind meter to determine wind speeds.  However, Martin found the handheld instrument to be inaccurate.  He has learned to identify wind conditions by observing trees blow.  He also uses a weather app on his cellphone to monitor the wind.

{¶ 10} On May 10, 2018, despite his employer having a handheld wind meter available, Martin decided to check weather conditions using the Weather Channel app on his cellphone.  He checked the weather conditions on site before starting application on the Bulow soybean field.  Martin began to spray the Bulow soybean field at 12:32 p.m.

{¶ 11} Martin applied a combination of Authority XL, Weedar Amine (2,4-D), Roundup PowerMax, Heno D, and water to the field using an RG1100 Rogator tractor. Authority XL, Weedar Amine (2,4-D), and Roundup PowerMax are all herbicides.  Heno D is a glyphosate activator that serves as a wind control and anti-foaming agent.  It is used to help avoid herbicide drift.  The conditions and manner in which herbicides can be

sprayed are governed by the labels on the individual herbicide products.[5]   As relevant to this case, the Weedar Amine (2,4-D) label provided as follows with respect to spray drift management:

> Do not apply at wind speeds greater than 15 mph.  Only apply this product if the wind direction favors on-target deposition and there are not sensitive areas (including, but not limited to, residential areas, bodies of water, known habitat for nontarget species, nontarget crops) within 250 feet downwind.   If applying a Medium spray, leave one swath unsprayed at the downwind edge of the treated field.

{¶ 12} The Roundup PowerMax label provided, in pertinent part, as follows:

> AVOID CONTACT OF HERBICIDE WITH FOLIAGE, GREEN STEMS, EXPOSED NON-WOODY ROOTS OR FRUIT OF CROPS (EXCEPT AS SPECIFIED FOR INDIVIDUAL ROUNDUP READY® CROPS), DESIRABLE PLANTS AND TREES, AS SEVERE INJURY OR DESTRUCTION COULD RESULT.
>
> *   *   *
>
> Do not allow the herbicide solution to mist, drip, drift, or splash onto desirable vegetation * * *."[6]

---

5.  The parties failed to introduce into the record full product labels for Authority XL, Weedar Amine (2,4-D), Roundup PowerMax, and Heno D.  Partial labels of Authority XL, Weedar Amine (2,4-D), and Roundup PowerMax were attached to the May 28, 2020 deposition of Kyle Martin.  Additionally, both Martin and Hannah Mathers, an herbicide and horticultural expert retained by the Merandas, testified as to some of the requirements set forth on the labels of Weedar Amine (2,4-D) and Roundup PowerMax.  Inspector Zachary Weber with the Ohio Department of Agriculture, Division of Plant Health, Pesticide & Fertilizer Regulations Section, quoted portions of the labels for Authority XL, Weedar Amine (2,4-D), and Roundup PowerMax in his June 28, 2018 Case Investigation Report, which was included as an exhibit to Martin's deposition.   This court's reference to the labels for Authority XL, Weedar Amine (2,4-D), Roundup PowerMax, and Heno D is limited to the information contained in the record before us.

6.  The Merandas contend Roundup PowerMax contained a restriction prohibiting it from being applied in wind conditions that exceeded 10 m.p.h.  In support of this claim, they rely on a statement made by Mathers in her December 1, 2020 report, wherein she states, "[Martin's] decision to spray was in violation of the most restrictive label (Roundup PowerMax) applied as a tank-mix on May 10, 2018 *which stated not above 10 mph*." (Emphasis added.)  The portion of Mathers' report submitted as summary judgment evidence does not quote or otherwise identify where the 10-m.p.h. restriction can be found on the Roundup PowerMax label.  Further, the portion of the Roundup PowerMax label included in the record on appeal, which was attached to Martin's deposition, does not set forth this restriction.  The June 28, 2018 Case Investigation Report from ODA investigator Weber does not mention a 10-m.p.h. restriction.  From the record before us, it cannot be determined whether Roundup PowerMax contains a restriction prohibiting it from being applied in winds in excess of 10 m.p.h. as the Merandas claim.

{¶ 13} Finally, the Authority XL label stated as follows:

The interaction of many equipment and weather-related factors determines the potential for spray drift. The applicator is responsible for considering all these factors when making application decisions. Avoiding spray drift is the responsibility of the applicator.

* * *

Drift potential increases at wind speeds of less than 3 mph (due to inversion potential) or more than 10 mph. However, many factors, including droplet size and equipment type determine drift potential at any given wind speed. AVOID GUSTY OR WINDLESS CONDITIONS.

{¶ 14} At the time Martin started his herbicide application of the Bulow soybean field, he indicated the sun was out, there were only a few clouds, and the wind was calm. However, as he was in the process of applying the herbicides, Martin noticed it was getting "breezy" and "a little gusty." Martin "could tell the chemical was starting to move a little bit." Martin was unsure of how far into the herbicide application of the 47-acre Bulow field he was when he noticed that the wind had picked up, but he decided to finish spraying the Bulow property before shutting down for the day. Martin completed the herbicide application at 1:34 p.m. He then filled out the Spray Order form for Cherry Fork. On this form, Martin noted he completed a burndown of the soybean field and that the wind speed was "15 mph" and from the "west." After finishing the Spray Order paperwork, he called Michelle to inform her he was not going to continue spraying that day due to the wind.

{¶ 15} The following day, on May 11, 2018, Martin sprayed Seth's home farm, applying Authority XL, Heno D, Durango, and water to farmland that surrounded the grapevines. Martin started the application at 8:09 a.m. and finished the application at 8:53 a.m. Martin's Spray Order form indicates that it was sunny that day, with winds coming out of the east and southeast at 5 m.p.h. Martin noted on the Spray Order form that he "went slow around grape vines to keep nozzles pressure at 9 psi." Martin indicated

there were no issues with chemicals drifting this day.

{¶ 16} While giving a customer a tour of the vineyard on May 11, 2018, Seth noticed damage to the grapes and grapevines in Block D. Seth reached out to Cherry Fork to find out what chemicals had been sprayed. Later that month, on May 29, 2018, David T. Daniels, the director of the Ohio Department of Agriculture ("ODA"), toured the Meranda Nixon Winery. Seth claims that Daniels noticed "spray damage" to the grapevines after touring Blocks C and D. On June 14, 2018, Seth contacted the ODA, Division of Plant Health, Pesticide & Fertilizer Regulation Section, to report that his grapevines had been damaged by spray drift following an herbicide application to a field adjacent to his vineyard.

{¶ 17} The ODA sent Zachary Weber to inspect the damage to Seth's grapevines and to conduct an investigation into the source of the damaged vines. Weber inspected Seth's property on June 18, 2018 and took samples from the property for testing. In a June 28, 2018 report ("the ODA's June 28, 2018 Case Investigation Report"), Weber noted that there was a "[v]isible damage pattern on the property. More damage starting from the west and less as you move east on Meranda property." Weber noted that in addition to Cherry Fork's May 10, 2018 herbicide application to the Bulow soybean field and its May 11, 2018 application to Seth's home farm, two other neighboring farms had applied herbicides to their properties prior to Weber's inspection. On June 3, 2018, Joshua Fussnecker applied a combination of Roundup PowerMax and Zidua PRO to the field south of Seth's property, and on June 8, 2018, Jerome Meranda applied the herbicide Liberty to the field north of Seth's property. Weber obtained data about wind speeds on the dates of the various herbicide applications from the weather station at the Clermont County Airport, which was located approximately 27.5 miles away from the vineyard. In the June 28, 2018 Case Investigation Report, Weber stated that at the time of appellees'

May 10, 2018 herbicide application to the Bulow soybean field, the wind was "16 mph bearing 300 [degrees] with gusts up to 22 mph" and for their May 11, 2018 application to Seth's home farm, the wind was "6 mph bearing 120 [degrees]." For the June 3, 2018 herbicide application at the Fussnecker farm, the wind was "11 mph bearing 290 [degrees] with gusts up to 18 mph." Finally, for the June 8, 2018 application to Jerome Meranda's Farm, the wind was "7 mph bearing 250 [degrees]."

{¶ 18} Weber concluded the June 28, 2018 Case Investigation Report with the following summary of his inspection:

> While viewing the [Seth] Meranda property, I did observe a noticeable pattern of damage. The most damage was observed on the far west side of the vineyard and the damage became less and less as you move toward the east. I did not observe any other pattern of damage around any of the other fields that surround the vineyard. The weather data collected does indicate that the wind was blowing in the direction of the Meranda Vineyard during the Cherry Fork Farm Supply application on 5/10/18. A chemical analysis of the plant tissue collected may tell if the active ingredients of the pesticides applied are present on the Merandas' property.

{¶ 19} On August 15, 2018, a "Notice of Warning" letter was issued to Martin by Matt Beal, the Plant Health Chief with ODA's Division of Plant Health, Pesticide & Fertilizer Regulation Section. The letter stated, in pertinent part, the following:

> Pursuant to the Ohio Department of Agriculture's (ODA) authority in section 921.30 of the Ohio Revised Code (ORC), this letter is to advise you that the Pesticide & Fertilizer Regulation Section found that you were operating in violation of the Ohio Pesticide Law. **Specifically, you have engaged in acts in violation of ORC 921.24 by applying a pesticide inconsistently with its labeled directions for use and by applying a pesticide at such a time or in such a manner as to cause damage or contaminate an adjacent property.**
>
> ORC 921.24(A) states that no person shall use a pesticide in a manner inconsistent with its label language. ORC 921.24(Q) states that no person shall refuse or fail to comply with this chapter, the rules adopted thereunder. Ohio Administrative Code (OAC) 901:5-11-02(B)(8) states that no

person shall apply pesticide to an area or a crop in such a manner or at such a time that adjacent crops, pasture land, water or other areas will be damaged or contaminated. A complaint was filed with ODA on June 14, 2018, by Seth Meranda regarding your pesticide application to a neighboring agricultural field. During our investigation, ODA reviewed the labels of the products you applied to the field in question. The label for Weedar 64 specifically states do not apply at wind speeds greater than 15 mph and only apply this product if the wind direction favors on target deposition and there are not sensitive areas within 250 feet downwind. Local weather stations reported that the wind speed was greater than 15 mph during your application. Visual observations and weather data confirm that there were sensitive areas within 250 feet downwind of your pesticide application. Therefore, you have violated ORC 921.24(A). Samples were collected from the Meranda property and testified positive for the pesticides that you applied to the field in question. Therefore you have violated ORC 921.24(Q) by failing to comply with OAC 901:5-11-02(B)(8).

**Pursuant to the above and ORC 921.30, ODA has issued this Notice of Warning. You are hereby instructed to make all pesticide applications in compliance with their labeled directions and to only apply pesticides at such a time or in such a manner, as to avoid damaging or contaminating adjacent properties.** [Bold sic.]

{¶ 20} Martin disputed the accuracy of the ODA's findings in the foregoing Notice of Warning letter. When deposed in May 2020, he maintained that the wind speeds were not greater than 15 m.p.h. at the time he sprayed the Bulow soybean field. However, he acknowledged that he was not checking the Weather Channel app during his chemical application. As for the direction the wind was blowing out of, Martin contended that though his Weather Channel app had stated west, he had written "west" on the Spray Order form, and the weather data the ODA had examined during its investigation indicated west (i.e., "bearing 300 [degrees]"), he nonetheless believed the wind had been coming out of the south, thereby pushing any spray drift north.

{¶ 21} During his deposition, Martin stated he was unsure of the size of the buffer zone between the Bulow soybean field and the grapevines planted in Block D of Seth's

home. When questioned about whether there was a 250-foot buffer zone between the two, Martin responded, "I can't be a hundred percent accurate on that." At one point, he estimated that the buffer zone between the soybean field and the vineyard was "over 150 [feet]."[7] A map created by the ODA indicated that at the narrowest point of the triangular shaped buffer zone separating the Bulow soybean field and the Block D grapes on Seth's property, there was only 114 feet of separation.

## II. PROCEDURAL HISTORY

{¶ 22} On April 16, 2019, the Merandas filed a complaint against Cherry Fork and Martin (collectively, "appellees"), setting forth causes of action for negligence, negligence per se, trespass, nuisance, strict liability, and negligent hiring, supervision, and training

---

7. When deposed, Martin was questioned as follows about the buffer zone between the vineyard and the soybean field:

Q: What about buffer zones, what's your understanding of what a buffer zone is?

[Martin]: Depending on how much distance they want between two crops.

Q: Do you know if there was a buffer zone between the chemical applications that you made on May 10th and May 11th and the vineyard?

[Martin]: Just the bean field that was between – the one bean field and the other one, right up against the vineyard.

Q: Do you know how many feet that was?

[Martin]: It would have to be, I would think, over 150 feet because it was over my boom length quite a bit, so –

* * *

Q: And do you know how many feet are between the vineyard and where that [soybean] field is located?

[Martin]: I cannot be a hundred percent accurate on that, no.

Q: Were you aware of the label requirements of a 250-feet buffer zone?

[Martin]: Yes.

Q: Was there a 250-feet buffer zone between the field you were spraying and the vineyard?

[Martin]: I can't be a hundred percent accurate on that.

relating to Martin's application of the herbicides. The Merandas argued appellees violated R.C. 921.24 by applying "herbicide inconsistently with the labeled directions and applying at such a time or in such a manner as to cause damage or contaminated [sic] an adjacent field." The Merandas contended appellees owed a duty to use reasonable care in applying the herbicides, to comply with all label restrictions, and to prevent or eliminate the risk that the herbicides would drift onto the adjacent vineyard. In addition to contending that appellees were negligent in their application of the herbicides, the Merandas also alleged that appellees' actions were "intentional, reckless, wanton, willful, and/or grossly negligent" and the Merandas sought punitive damages as well as treble damages under R.C. 901.51. They also sought damages for the costs to rehabilitate the grapevines, for the replacement and maintenance of the vines, for the diminution of value in the property, for the damage to the winery's business goodwill or brand, for loss of future profits or proceeds, and for the mental anguish and emotional distress they suffered. Appellees filed an answer denying the allegations in the complaint and setting forth a variety of defenses, including that the Merandas' claims were barred by the doctrines of primary assumption of the risk and implied assumption of the risk.

{¶ 23} The parties engaged in discovery. During the discovery process, the Merandas identified a number of experts they would potentially call at trial, including Hannah Mathers, Ph.D., an herbicide and horticultural expert, and Gary Pavlis, Ph.D. a wine judge and viticulture expert.

{¶ 24} In April 2022, appellees moved for summary judgment on all of the Merandas' claims. Appellees claimed that the Merandas could not prevail on their negligence-based claims because they had knowingly assumed the risk of damage to the vines when Seth directed appellees to proceed with the May 10, 2018 herbicide spray despite the weather conditions and the fact that his grapes had already experienced

budbreak. Appellees further contended that the Merandas could not prevail on their negligence-based claims because they had failed to identify an expert who was qualified to testify about the standard of care a commercial applicator owed in the spraying of herbicides to a field adjacent to grapevines.

{¶ 25} As for the Merandas' negligence per se claim, appellees argued that the Merandas could not demonstrate that Martin violated statutory law, specifically R.C. 921.24, in his application of the herbicides. Appellees contended the ODA's June 28, 2018 Case Investigation Report from Weber could not be relied on as evidence that the herbicide labels were not complied with as the report contained inadmissible hearsay and was based on irrelevant wind data from Clermont County Airport, which was located nearly 30 miles away from the Merandas' grapevines. Appellees also argued that R.C. 921.24 also could not serve as the basis of the Merandas' strict liability claim, as there was existing case law indicating the statute was not a strict liability statute.

{¶ 26} As for the Merandas' trespass and nuisance claims, appellees argued the Merandas could not establish that appellees intentionally caused the herbicides to drift onto the nearby grapevines. Appellees contended that there was no evidence that the application of the herbicides constituted abnormally dangerous conduct or that Martin was negligent or reckless in his application of the herbicides. As for the Merandas' claim that Cherry Fork was liable for the negligent hiring, supervision, and training of Martin, Cherry Fork contended that the claims failed as the Merandas could not prove that Martin was incompetent or that Cherry Fork knew of his incompetency.

{¶ 27} Finally, appellees argued that the Merandas could not recover damages for emotional distress as they had not pled a cause of action for intentional or negligent infliction of emotional distress. As for the other damages the Merandas sought, appellees contended the Merandas could not recover loss profits, loss of overall market reputation,

or damages for the value to the goodwill or brand of the winery as the winery was not a proper party to the case. Instead, appellees argued the Merandas were limited to seeking damages for the costs of the reasonable restoration of the grapevines to their preexisting condition or to a condition as close as reasonably feasible, without requiring grossly disproportionate expenditures and with allowance for the natural process of regeneration within a reasonable period of time. Finally, appellees argued the Merandas' claims for punitive damages and treble damages failed as there was no evidence of actual malice or recklessness by Martin or Cherry Fork.

{¶ 28} In support of their motion for summary judgment, appellees attached Seth's and Martin's answers to interrogatories, deposition testimony from Maura and Seth Meranda, from Cherry Fork's office manager Michelle Meranda, and from Martin, and various exhibits used during their depositions, including a map of Seth's property; the May 10, 2018 Spray Ticket for the Bulow soybean field; the ODA's June 28, 2018 Case Investigation Report from Weber; a June 15, 2018 news article entitled "Meranda Nixon Winery visited by head of department of agriculture" from the Brown County Press; the August 15, 2018 Notice of Warning letter from the ODA; and copies of Martin's state-issued commercial applicator and fertilizer applicator licenses.[8] Also attached to appellees' summary judgment motion were documents that were not included as deposition exhibits and were not attached to an affidavit. These documents included a deed for Seth's farm; a June 18, 2018 letter from Seth to the ODA; a 2018 Spray Orders Spreadsheet from Cherry Fork; weather data from the United States Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA") for the weather

---

8. Appellees filed the full deposition transcripts of Martin, Michelle, Seth, Maura, Mathers, and Pavlis. Included with these transcripts were various exhibits referenced during the depositions. To the extent the exhibits were identified in the deposition transcript and were filed with the full depositions, such documents are properly before this court.

station at the Clermont County Airport from May 10 and 11, 2018 and June 3 and 8, 2018; a Statement of Revenues Lost from the winery; and two reports, dated April 1, 2021 and February 1, 2022, from appellees' expert Keith A. Hock, a certified public accountant, certified financial forensics analyst, and certified valuation analyst.

{¶ 29} The Merandas filed a memorandum in opposition to summary judgment in which they conceded that summary judgment was appropriate on their strict liability claim, but argued that genuine issues of material fact existed on their remaining claims and requests for damages. With respect to their negligence claim, the Merandas argued that an expert was not necessary to establish the standard of care owed in this case as the jury was capable of understanding that the herbicide labels were supposed to be followed. Alternatively, even if an expert was required, the Merandas argued that Mathers qualified given her experience as a chemical applicator and the fact that she once held a commercial applicator license. The Merandas also argued that the doctrine of primary assumption of the risk did not apply to their negligence-based claims and, with respect to the doctrine of implied assumption of the risk, genuine issues of fact existed as to whether they consented to or acquiesced in an appreciated or known risk. The Merandas argued they had no knowledge that Martin would not comply with the product labels when applying the herbicides or that the weather conditions were adverse on May 10, 2018.

{¶ 30} As for their negligence per se claim, the Merandas argued the ODA's August 15, 2018 Notice of Warning letter was evidence that Martin violated R.C. 921.24(A) and (Q) by spraying herbicides without an appropriate buffer zone and in wind conditions that exceeded 15 mph. The Merandas argued that the weather data obtained from the Clermont County Airport, which was the closest nearby airport weather station, was relevant in establishing wind direction and wind speeds at the time Martin sprayed the herbicides on the soybean field that adjoined Seth's farm.

{¶ 31} With respect to their trespass and nuisance claims, the Merandas contended that issues of fact existed as to whether Martin's conduct in spraying the herbicides in windy weather was negligent, reckless, or unreasonable. They further argued that issues of fact existed as to Cherry Fork's negligent hiring, supervision, and training of Martin, as Mathers' had opined in her report that Martin was not a "well-trained applicator."

{¶ 32} Finally, with respect to the treble and punitive damages they were seeking, the Merandas argued genuine issues of material fact existed as to whether Martin acted recklessly or with actual malice by knowing of the weather conditions and consciously disregarding those risks by spraying anyways. They also argued that in addition to recovering damages for the value of the damaged grapevines, they were also entitled to recover damages for the emotional distress they suffered and for the decreased production and loss profits suffered by the winery.

{¶ 33} To support their arguments in opposition of summary judgment, the Merandas relied on appellees' answers to interrogatories, deposition testimony from Seth, Maura, Michelle, Martin, and Mathers, and certain exhibits used during those depositions, including the May 11, 2019 Spray Ticket for Seth's home farm and a map of Seth's farm. Also attached to the Merandas' memorandum in opposition to summary judgment were documents that were not included as deposition exhibits and were not attached to an affidavit. These documents included selective pages from a December 1, 2020 report from Mathers, a table entitled "Production History of Meranda-Nixon Winery," and a November 25, 2020 report from their expert Pavlis.

{¶ 34} Appellees filed a reply memorandum in support of their motion for summary judgment, once again arguing that the Merandas had assumed the risk of damage to their grapevines by requesting a chemical burndown of the neighboring soybean field after

budbreak on the vines. Appellees contended the evidence demonstrated Seth specifically requested the use of Authority XL, Roundup PowerMax, and Weedar Amine (2,4-D) on the soybean field and he authorized the spraying of the field on May 10, 2018 with knowledge of the weather conditions. They continued to maintain that Mathers, a horticulturalist, was not qualified to provide expert testimony of the standard of care of a commercial applicator, and that wind data utilized from the Clermont County Airport was irrelevant and unreliable in establishing wind conditions at the Bulow soybean field. Finally, with respect to the ODA's August 15, 2018 Notice of Warning letter indicating appellees had violated R.C. 921.24(A) and (Q), appellees indicated they had obtained two experts, William W. Witt, Ph.D., an herbicide and weed science researcher, and Matthew J. Doyle, a vineyard owner and vineyard management advisor, who disputed the accuracy of the ODA's investigation. Appellees attached an April 1, 2021 report and a January 25, 2022 report from Witt, a February 3, 2022 report from Doyle, and purported cellphone records from Michelle to their reply brief. The Witt and Doyle reports and the cellphone records were not included as deposition exhibits to any of the submitted depositions and were not attached to any affidavits.

{¶ 35} On September 1, 2022, appellees' motion for summary judgment was granted in part and denied in part by a magistrate. The magistrate found summary judgment was appropriate on the Merandas' strict liability claim and claim for emotional distress damages, but found that material issues of fact remained on the Merandas' claims for "1) Negligence; 2) Negligence per se; 3) Nuisance; 4) Negligent hiring, supervision and training; 5) Punitive damages claim * * *; 6) Compensatory damages claim * * *; [and] 7) Treble damages claim." With respect to these claims, the magistrate stated, "it is obvious that many of the material facts of this case are in dispute. The Court cannot weigh evidence when deciding a motion for summary judgment. When the

defense alleges a flawed investigation by the Plaintiffs and their witnesses, they themselves demonstrate genuine issues of material fact." The magistrate made no ruling on the Merandas' trespass claim.

{¶ 36} Appellees filed timely objections to the magistrate's decision, contending, among other things, that the magistrate erred in relying on the "flawed" June 28, 2018 ODA Case Investigation Report to create issues of fact as the report constituted inadmissible hearsay and relied on irrelevant wind data from an airport located nearly 30 miles away from the location of the herbicide spray. Appellees also argued the magistrate erred in finding that issues of fact remained on the Merandas' negligence-based claims and claims for punitive and treble damages as the Merandas failed to identify an expert qualified to testify about the standard of care owed by a commercial applicator and the type of damages that would result from a breach of that standard of care. They further argued the evidence they submitted demonstrated the Merandas' claims were barred by the assumption-of-the-risk doctrine as Seth requested application of the herbicides on the soybean field after budbreak and with knowledge of the weather conditions on May 10, 2018.

{¶ 37} The Merandas did not file a response to appellees' objections to the magistrate's decision. On November 15, 2022, the trial court requested additional briefing from the parties. On December 19, 2022, after receiving the additional briefing, the trial court issued a decision sustaining appellees' objections and entering summary judgment for appellees on all of the Merandas' claims. The court found "as a matter of law that the wind speed 30 miles away is irrelevant to the proof of claims herein for negligence; negligence per se; nuisance; and negligent hiring, supervision and training." The court further found that "[c]ontrary to the argument of the [Merandas], it is necessary to have expert testimony to establish the causal connection between the actions or inactions of

the defendants and the claims of negligence and negligence per se."  The court stated:

> [The Merandas'] expert Hannah Mathers formed her opinion solely upon the flawed hearsay report of the ODA.  [The Merandas'] expert does not hold a commercial applicator's license and she admitted she had never worked as an expert on a case involving herbicide drift into grapevines.  [The Merandas] failed to provide ODA investigator Zachary Weber's CV to even qualify his testimony contained in the ODA report pertaining to the standard of care of a commercial applicator.  This renders the report's findings inadmissible hearsay.
>
> [Appellees'] expert Dr. William Witt, an expert in crop science, with specific experiences conducting research on herbicidal weed control and cropping sites explicitly opined that "winds were tolerable and accepted speeds for purposes of Mr. Martin's [May 10, 2018] application."  He opined that "the fact that drift occurs does not mean that there was any negligence or wrongdoing on the part of the commercial applicator" and that "Cherry Fork Farm Supply and Kyle Martin acted reasonably and appropriately and within reasonable accepted standards of care at all times."  * * *  [Appellees'] expert, Matt Doyle, who is a managing member and owner of Doyle Vineyard Management, opined that defendant Martin's procedure for monitoring the wind conditions was appropriate and within the standard of care utilized by commercial spray operators.  * * * Thus, there is no issue of material fact as to whether defendants breached the standard of care.  They did not.
>
> * * *
>
> There was lack of evidence as to causation.  [The Merandas] failed to produce any records of the sprays that they themselves completed.  It is undisputed that adjacent property owners applied chemicals to their crops in the days between the date of the alleged incident, May 10, 2018, and the time plaintiffs reported any damage to the ODA on June 14, 2018.  * * *

{¶ 38} The court further determined that there was "no viable" claim for trespass and that the Merandas failed to put forth any evidence of recklessness on the part of appellees to support a claim for nuisance.  With respect to the Merandas' claim that Cherry Fork was negligent in hiring, supervising, and training Martin, the court found that

Mathers was not qualified to attest to Martin's training or competence. The court further found that the Merandas had not provided evidence that Cherry Fork had any knowledge of Martin's purported incompetence. Finally, the court entered summary judgment in favor of appellees on the Merandas' requests for punitive damages, treble damages, and compensatory damages.

### III. APPEAL

{¶ 39} The Merandas timely appealed the trial court's decision, raising the following as their sole assignment of error:

{¶ 40} THE TRIAL COURT IMPROPERLY GRANTED SUMMARY JUDGMENT TO APPELLEES.

{¶ 41} Within their assignment of error, the Merandas argue that the trial court "made multiple errors of law" and ignored evidence demonstrating that genuine issues of material fact exist on their negligence, negligence per se, nuisance, trespass, and negligent hiring, supervision, and training claims, as well as their requests for punitive and treble damages. The Merandas do not challenge the trial court's finding that Mathers was not qualified to opine on the standard of care owed by a licensed commercial applicator, but do challenge the trial court's finding that expert testimony was needed to establish duty and breach for their negligence-based claims. They further challenge the trial court's decision to disregard the weather data obtained from the Clermont County Airport and the ODA's June 28, 2018 Case Investigation Report.

### A. Standard of Review

{¶ 42} "An appellate court's examination of a trial court's decision to grant summary judgment is subject to de novo review." *French v. New Paris*, 12th Dist. Preble No. CA2010-05-008, 2011-Ohio-1309, ¶ 17, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). De novo review means that this court uses the same standard

that the trial court should have used and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial. *Morris v. Dobbins Nursing Home*, 12th Dist. Clermont No. CA2010-12-102, 2011-Ohio-3014, ¶ 14.

{¶ 43} Civ.R. 56 sets forth the summary judgment standard. "Pursuant to that rule, a court may grant summary judgment only when (1) there is no genuine issue of any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party." *Spitzer v. Frisch's Restaurants, Inc.*, 12th Dist. Butler No. CA2020-12-128, 2021-Ohio-1913, ¶ 6, citing *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.). "A material fact is one which would affect the outcome of the suit under the applicable substantive law." *Hillstreet Fund III, L.P. v. Bloom*, 12th Dist. Butler No. CA2009-07-178, 2010-Ohio-2961, ¶ 9, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

{¶ 44} The party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists. *Touhey v. Ed's Tree & Turf, LLC*, 194 Ohio App.3d 800, 2011-Ohio-3432, ¶ 7 (12th Dist.), citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). Once this burden is met, the nonmoving party "'must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings.'" *Oliphant v. AWP, Inc.*, 12th Dist. Butler No. CA2019-02-036, 2020-Ohio-229, ¶ 31, quoting *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7, citing Civ.R. 56(E). "Summary judgment is proper if the nonmoving party fails to set forth such facts." *Taylor v. Atrium Med. Ctr.*, 12th Dist. Warren No. CA2018-07-074, 2019-Ohio-447, ¶ 10. "In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Id.*

**B. Preliminary Matters**

{¶ 45} Prior to addressing the Merandas' argument that summary judgment was improperly awarded to appellees, we find it necessary to discuss a few evidentiary issues that will impact our analysis of the summary judgment motion.

**1. Civ.R. 56(C) Evidence**

{¶ 46} "Civ.R. 56(C) provides an exclusive list of materials that a trial court may consider when deciding a motion for summary judgment." *State ex rel. Varnau v. Wenninger*, 12th Dist. Brown No. CA2009-02-010, 2011-Ohio-3904, ¶ 7, citing *Spier v. American Univ. of the Caribbean*, 3 Ohio App.3d 28, 29 (1st Dist.1981). Those materials are "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact." Civ.R. 56(C). "[A] party may properly introduce evidence not specifically authorized by Civ.R. 56(C) by incorporating it by reference through a properly framed affidavit pursuant to Civ.R. 56(E)." *Wilson v. AIG*, 12th Dist. Butler No. CA2007-11-278, 2008-Ohio-5211, ¶ 29; *Wenninger* at ¶ 7.

{¶ 47} "'In general, no evidence or stipulation may be considered in ruling on a summary judgment motion except as stated in Civ.R. 56.'" *Fontain v. H&R Cincy Properties, L.L.C.*, 12th Dist. Warren No. CA2021-02-015, 2022-Ohio-1000, ¶ 66, fn. 7, quoting *U.S. Bank Natl. Assn. v. Crow*, 7th Dist. Mahoning No. 15 MA 0113, 2016-Ohio-5391, ¶ 18. However, a trial court may, in its discretion, consider documents other than those enumerated in Civ.R. 56(C) if there has been no objection by the opposing party. *Johnson v. Sears Roebuck & Co.*, 12th Dist. Clermont No. CA2000-03-017, 2000 Ohio App. LEXIS 3668, *5-6 (Aug. 14, 2000); *Grizinski v. Am. Express Fin. Advisors, Inc.*, 187 Ohio App.3d 393, 2010-Ohio-1945, ¶ 18 (12th Dist.). "[T]he failure of a party to move to strike or otherwise object to documentary evidence submitted by an opposing party in support of or in opposition to a motion for summary judgment waives any error in

considering such evidence under Civ.R. 56(C)." *Payne v. Rumpke*, 4th Dist. Ross No. 22CA26, 2023-Ohio-4760, ¶ 21, fn. 7.

{¶ 48} In the present case, both appellees and the Merandas attached exhibits to their respective memorandums in support or in opposition to summary judgment that were not incorporated by reference through an affidavit and are not the type of materials enumerated in Civ.R. 56(C).[9]   Neither party moved to strike those exhibits from consideration or, with the exception of the ODA's June 28, 2018 Case Investigation Report, objected to the court considering the exhibits in determining whether summary judgment was appropriate.  It appears that the trial court considered these exhibits in ruling on appellees' motion for summary judgment, mentioning some of the exhibits by name.  The trial court acted within its discretion in considering the Civ.R. 56(C) nonconforming exhibits and this court will likewise consider such exhibits in determining whether summary judgment was properly entered in appellees' favor.

## 2.  ODA's June 28, 2018 Case Investigation Report

{¶ 49} The ODA's June 28, 2018 Case Investigation Report was attached to appellees' motion for summary judgment.  Appellees presented the document and argued that it could not be relied upon by the Merandas to create an issue of fact as to any of their claims as the report (1) constituted an inadmissible hearsay document and (2) utilized irrelevant and "unreliable" weather data from the Clermont County Airport, which was located nearly 30 miles away from the site of the herbicide application.  The trial court agreed with appellees' arguments, referring to the report as a "flawed hearsay report" and finding information set forth in the report regarding wind speed at the Clermont County Airport "irrelevant to the proof of claims herein for negligence; negligence per se;

---

9. We previously identified the exhibits that did not comply with Civ.R. 56(C) requirements in ¶ 28, 33, and 34.

- 23 -

nuisance; and negligent hiring, supervision, and training." The Merandas dispute that the report is inadmissible and contend that the weather data was relevant to demonstrating that Martin sprayed herbicides in wind conditions that exceeded 15 m.p.h. in violation of the herbicide labels.

{¶ 50} "Hearsay statements, i.e., statements other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted, are not admissible evidence in a summary judgment context unless an exception to the rule applies." *Koop v. Speedway SuperAmerica, L.L.C.*, 12th Dist. Warren No. CA2008-09-110, 2009-Ohio-1734, ¶ 11, citing Evid.R. 801. The Merandas contend the ODA's June 28, 2018 Case Investigation Report falls into the hearsay exception set forth in Evid.R. 803(8). This provision provides that the following type of evidence is not excluded by the hearsay rule, even though the declarant is available as a witness:

> **(8) Public records and reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.

Evid.R. 803(8). Under this rule, "'evaluative and investigative reports * * * are not admissible into evidence as exceptions to the hearsay rule pursuant to Evid.R. 803(8)(b).'" *Hager v. Norfolk & W. Ry. Co.*, 8th Dist. Cuyahoga No. 87553, 2006-Ohio-6580, ¶ 22, quoting *Pool v. Wade*, 115 Ohio App.3d 449, 453 (6th Dist.1996). *See also State v. Humphries*, 79 Ohio App.3d 589, 597 (12th Dist.1992); *Cincinnati Ins. Co. v.*

*Volkswagen*, 41 Ohio App.3d 239, 241-242 (10th Dist.1987).[10]

{¶ 51} The June 28, 2018 Case Investigation Report was an investigative report authored by ODA Investigator Weber. As investigative reports do not fall within the exception set forth in Ohio Evid.R. 803(8), the report and its contents was properly excluded by the trial court.

{¶ 52} Furthermore, in addition to containing investigative statements from Weber, the report sets forth statements made by other individuals. Specifically, the report includes statements from Seth, Michelle, Jerome Meranda, and Joshua Fussnecker about what herbicides were sprayed on various properties and when the various herbicide applications occurred. "'[N]either subdivision (a) or (b) of [Ohio Evidence] Rule 803(8) embraces statements made by persons outside the official agency, *i.e.*, private citizens. Where sources outside the agency have made statements or contributed information, the issue is one of multiple hearsay.'" *Volkswagen* at 242, quoting 1 Weissenberger, *Ohio Evidence*, Section 803.108, Chapter 801, at 95. "[H]earsay statements which do not have an independent source of admissibility * * * are inadmissible under * * * Evid.R. 803(8)." *Freeman v. Beech Aircraft Corp.*, 12th Dist. Butler Nos. 80-11-0119 thru 80-11-0121, 1983

---

10. Compare Ohio Evid.R. 803(8) to its federal counterpart. Fed.R.Evid. 803(8) provides the following public records exception to the hearsay rule:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> **(8)** *Public records.* A record or statement of a public office if: (A) it sets out (i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) *in a civil case, or against the government in a criminal case, factual findings from a legally authorized investigation*; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

(Emphasis added.) Therefore, under Fed.R.Evid. 803(8)(A)(iii), government evaluative and investigative reports constitute an exception to the hearsay rule. Ohio did not adopt this portion of the federal rules relating to government investigative reports. *Hager v. Norfolk & W. Ry. Co.*, 8th Dist. Cuyahoga No. 87553, 2006-Ohio-6580, ¶ 22.

Ohio App. LEXIS 15878, *50 (Sept. 30, 1983). Therefore, in addition to the June 28, 2018 Case Investigation Report being inadmissible as an investigative report, it is also inadmissible as it contains hearsay statements about the chemical applications that occurred at Jerome Meranda's and Joshua Fussnecker's farms.[11] *See Volkswagen* at 242-243 (finding that National Highway Traffic Safety Administration reports should have been excluded from evidence where "significant portions of the reports contain hearsay statements which are not firsthand observations of the official making the reports and further contain evaluative or investigative information from the NHTSA"). Accordingly, the ODA's June 28, 2018 Case Investigation Report and the hearsay statements contained therein, will not be considered by this court in analyzing the merits of appellees' motion for summary judgment.

### 3. Weather Data from Clermont County Airport

{¶ 53} The ODA's June 28, 2018 Case Investigation Report set forth weather data for Martin's May 10, 2018 application of the Bulow soybean field. This information was obtained from the weather station located at the Clermont County Airport. The trial court found that weather data indicating "wind speed 30 miles away" from the site of the herbicide application was, as a matter of law, "irrelevant." The Merandas challenge this finding.

{¶ 54} We first note that the weather data set forth in the ODA's June 28, 2018 Case Investigation Report is not properly before this court as the report was excluded as inadmissible hearsay. The question then becomes whether there is weather evidence

---

11. Weber states in the ODA's June 28, 2018 Case Investigation Report that he received "application records" from Jerome Meranda and Joshua Fussnecker about the herbicide sprays they conducted on their properties. These "application records" were not attached to the ODA's June 28, 2018 Case Investigation Report that was produced during Martin's deposition or to the copy of the report submitted as "Exhibit 11" to appellees' motion for summary judgment. They were also not identified as an exhibit in any deposition that was filed with the court in support or opposition to summary judgment.

independent of the June 28, 2018 Case Investigation Report that was submitted in support or in opposition to appellees' motion for summary judgment. We find that there was. In addition to the ODA's August 15, 2018 Notice of Warning Letter stating that "[l]ocal weather stations reported that the wind speed was greater than 15 mph during [Martin's] application," there was also weather data from the NOAA presented for the weather station at the Clermont County Airport. The NOAA weather data was submitted by appellees, in an effort to challenge Weber's investigatory findings in the June 28, 2018 Case Investigation Report. The weather data obtained from the NOAA set forth the local climatological data and hourly observations for the weather station at the Clermont County Airport. The following chart sets forth the relevant data as it relates to Martin's May 10, 2018 herbicide application of the Bulow soybean field, which began at 12:32 p.m. and ended at 1:34 p.m.:

| TIME | WIND SPEED (m.p.h.) | WIND DIRECTION (Degree) | WIND GUSTS (m.p.h.) |
|---|---|---|---|
| 12:17 p.m. | 14 | 270 | 23 |
| 12:36 p.m. | 16 | 300 | 22 |
| 12:57 p.m. | 14 | 300 | 24 |
| 1:17 p.m. | 11 | VRB [variable] | 24 |
| 1:36 p.m. | 11 | 290 | 22 |

{¶ 55} We find that the trial court erred in holding that the weather data from the Clermont County Airport weather station was, as a matter of law, irrelevant. What the wind conditions were like at the time of appellees' herbicide application to the Bulow soybean field is an issue of fact, not one of law. The weather conditions at the Clermont County Airport, the closest airport to the Bulow soybean field and Seth's home farm, provided an approximation of what the wind conditions were like at the soybean field at

the time of appellees' herbicide application. *See, e.g., Springer v. United States*, 641 F.Supp. 913, 921 (D.S.C.1986) (finding that surface weather observations at an airport 17.2 miles away "approximated" the surface weather conditions at the site of an airplane crash). The weather data from the Clermont County Airport indicated that at the time of Martin's herbicide application to the Bulow soybean field, the wind was coming out of the west or west-by-northwest and was consistently between 11-16 m.p.h., with gusts of 22-24 m.p.h. As winds do not stop at the county line, it is relevant and reasonable to utilize available weather data from the closest airport-weather station to approximate the wind conditions at the site of the herbicide application in Ripley, Ohio. Accordingly, we shall consider the NOAA weather data from the Clermont County Airport in examining whether summary judgment was appropriately entered in appellees' favor on the Merandas' claims.[12]

### 4. Expert Mathers

{¶ 56} The trial court found Mathers was not qualified to give an expert opinion on the standard of care owed by a commercial applicator as she "does not hold a commercial applicator's license and * * * had never worked as an expert on a case involving herbicide drift onto grapevines." The court further found that her opinion was premised "solely upon the flawed hearsay report of the ODA." The court, therefore, disregarded her expert report and deposition testimony in its entirety.

{¶ 57} The Merandas did not assign as error the trial court's determination that Mathers was not qualified to opine on the standard of care owed by a commercial applicator. As such, we will not revisit this holding by the trial court. However, we do find

---

12. We note that a factfinder is free to believe or disbelieve that the weather conditions at the Bulow soybean field were as windy as the conditions at the Clermont County Airport. A factfinder may choose instead, to credit Martin's testimony about the weather conditions at the Bulow soybean field at the time of the herbicide application. The weight to be given to the NOAA Clermont County Airport weather data is for the factfinder to decide—not the trial court on summary judgment.

it necessary to discuss whether Mathers' opinion must be disregarded in whole, or whether she is qualified to opine on the type of damages the grapevines sustained and the cause of such damages.

{¶ 58} Evid.R. 702 provides that a witness may testify as an expert if (1) the witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 59} In her curriculum vitae ("C.V.") and her deposition testimony, Mathers set forth and discussed her specialized knowledge, experience, education, and training as it related to herbicidal weed control and the effects various herbicides have on different types of crops and trees.[13]  Mathers has a doctorate degree and Masters of Science degree in horticulture, a Bachelor of Science degree in plant science and pomology, and associate degrees in forestry and agriculture.  She has over 33 years of professional experience, which has included working as an independent researcher for her own firm; conducting research trials funded by agriculture and horticulture chemical and fertilizer companies and nurseries; teaching at various colleges and universities, including a 14-year tenured teaching position in the Department of Horticulture and Crop Science at the Ohio State University; working as a senior research fellow studying, among other things, herbicide and bio-herbicide research and other nursery/floriculture industry production

---

13. The Merandas attached Mathers' C.V. to their response to the trial court's November 15, 2022 request for additional briefing.  Among the issues the trial court requested additional briefing on were (1) whether Mathers had used her commercial applicator's license when she possessed one, (2) her qualifications to be considered a commercial applicator expert, and (3) what information she based her expert opinion on and whether that information was unreliable.  Appellees did not move to strike Mathers' C.V. or otherwise object to the trial court's consideration of the C.V.

practices; and serving as a nursery crops industry specialist who inspected plantings for diagnosis of special problems and made recommendations concerning the safe use of pesticides. Mathers' C.V. indicates that she has "conducted thousands of herbicide efficacy and phytotoxicity trials, invented five new bio-herbicides, [and] assisted in the registration of 14 new herbicides in the United States nursery industry." She has served as an expert in over 29 court cases since 2015 and those cases involved "insecticides and fungicides, agronomic crops including pasture lands, soybeans and corn rights-of-way (vegetation management), and other horticulture crops such as * * * tree fruits, nuts, and vegetables and herbicide exposure of Vietnam era USA veterans."

{¶ 60} Though Mathers did not have a current Ohio commercial applicator's license, she previously held one that she let lapse in either 2016 or 2019. However, she only used her commercial applicator's license once, when conducting an application at an Ohio nursery. Though Mathers used her commercial applicator license in a limited manner, she routinely sprayed herbicides as a private applicator at commercial properties. She estimated that for the past eight years, she has spent over 150 hours a year applying pesticides to fields commercially.

{¶ 61} Mathers indicated she has been involved in several cases where there was 2,4-D drift onto crops, though she acknowledged during her deposition that this is the first case she had been involved in where there were allegations of pesticide drift onto grapevines. Prior to inspecting the Merandas' vineyard for herbicide-drift damage, she had inspected three vineyards in Michigan when she was conducting "cold-hardiness studies." She indicated the scope of her knowledge with respect to the impact of 2,4-D drift onto grapevines was based on literature review, her knowledge of grapes, viticulture, chemistry, biochemistry, and stress physiology. She explained that where grapevines are exposed to 2,4-D, one would see damage consisting of

[p]uckering of the leaves. A cupping of the leaves, chlorosis as mainly marginal and to the apex. Particularly damage in integral growing regions, the meristems, that would include the fruiting bunches, abortion therefor of the fruit in the bunch, lack of ability to color. Let me see, molted growth, strap-like growth.

{¶ 62} When deposed, Mathers testified she visited the Merandas' vineyard in August 2019 to inspect the grapevines, which was almost 16 months after Martin's May 10, 2018 herbicide spray. In addition to taking photographs of the damaged vines, Mathers also took random samples of the grapevines for testing. She relied on her own inspection of the grapevines, information set forth in the ODA's June 28, 2018 Case Investigation Report regarding spray records from properties surrounding the Merandas' vineyard, reviewed Martin's and Michelle's depositions, and looked at weather data relating to the May 10, 2018 spray in forming her opinion as to the cause of the damage to the Merandas' grapevines. In a December 1, 2020 report, Mathers opined, in pertinent part, as follows:

> Extensive damage was done [to] Meranda-Nixon Winery due to drift on May 10, 2018. Conditions, spray label violations and damages are well documented in this report. In this report we found that the effects of the 2,4-D drift in 2018, and based on the literature and nature of the chemicals applied and my site inspection, [it] has continued into 2019, and will continue into 2020 and beyond. Evidence of 2,4-D injury and carryover is significant. Furthermore, 2,4-D has been linked to reproductive injury (Hatterman-Valenti, 2005). The reduction in flower potential will further decline the salability of Meranda-Nixon wines. Mr. Martin had numerous label violations, and weather conditions promoted drift on a sensitive crop. Despite all the warnings, Mr. Martin, applied his tank mix o[f] 2,4-D and glyphosate, perhaps only looking at those sections pertinent to killing the weeds he wanted to kill. In doing so he acted * * * with no respect for the high value or Mr. Meranda's crop, the long-term consequence losing such a crop would entail, loss of reputation, and after-effects on the vineyard and the Meranda's [sic] income.

Subsequent to her written report, Mathers reviewed expert reports from appellees'

experts Witt and Doyle. She also reviewed photographs taken in August 2021 of the Merandas' grapevines. Nothing she reviewed after authoring her December 2020 report caused her to revise her determination that the Merandas' grapevines were damaged as a result of Martin's May 10, 2021 herbicide application.

{¶ 63} We find that the trial court erred in completely disregarding Mathers' opinion. The record does not support the trial court's finding that "Mathers' formed her opinion solely upon the flawed hearsay report of the ODA." As set forth above, Mathers formed her opinion as to the cause of the damage to the Merandas' grapevines using more than just the ODA's June 28, 2018 Case Investigation report. She inspected the grapevines herself, took samples of the vines, reviewed Martin's and Michelle's deposition testimony, examined weather data, and considered herbicide applications that took place near Seth's property.

{¶ 64} Appellees sought to discredit Mathers' opinion by arguing that she failed to review all the pertinent information in the case. Appellees pointed out Mathers did not review Seth's and Maura's deposition testimony, did not view the exhibits utilized during Martin's deposition testimony, and did not examine the May 10, 2018 spray order form completed by Martin. While these omissions go to the weight a factfinder may give her testimony or opinion as to the cause of the damages sustained by the Merandas' grapevines, they do not prevent Mathers' from offering a qualified expert opinion as to the cause of the damages.

{¶ 65} Accordingly, given Mathers' specialized knowledge, experience, training, and education in the field of herbicides and the effects of herbicide drift, we find that she is qualified to provide an expert opinion regarding those topics. Mathers' testimony clearly relates to matters beyond the knowledge or experience possessed by lay persons and, contrary to the trial court's finding, was based on reliable scientific, technical, or other

specialized information. Therefore, where appropriate, we shall consider her deposition testimony and expert report in examining whether summary judgment was appropriately entered in appellees' favor on the Merandas' claims.

{¶ 66} With these considerations in mind, we turn to the individual causes of action pled by the Merandas and whether summary judgment was properly entered in appellees' favor on each cause of action.

### C. The Merandas' Causes of Action & Damage Requests

### 1. Negligence and Negligence Per Se

{¶ 67} The Merandas contend the trial court erred in granting summary judgment to appellees on their negligence and negligence per se claims. They argue the trial court "wrongly concluded that expert testimony was needed to establish duty and breach" and further contend that their claims are not barred by the doctrine of assumption of the risk.

{¶ 68} Negligence and negligence per se are closely intertwined concepts. *Arnett v. Mong*, 12th Dist. Fayette No. CA2015-10-022, 2016-Ohio-2893, ¶ 8. "To establish a negligence claim, the plaintiff must demonstrate (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the duty of care, and (3) as a direct and proximate result of the defendant's breach, the plaintiff was injured." *Oliphant*, 2020-Ohio-229 at ¶ 32. "A plaintiff's inability to prove any one of these elements is fatal to his or her claim of negligence." *Id.*

{¶ 69} With negligence per se, proof of a violation of a statute that sets forth specific duties "dispenses with a plaintiff's burden in a simple negligence case of proving the existence of a duty and breach of that duty." *Allstate Ins. Co. v. Henry*, 12th Dist. Butler No. CA2006-07-168, 2007-Ohio-2556, ¶ 10. *See also Swader v. Paramount Property Mgt.*, 12th Dist. Butler No. CA2011-05-084, 2012-Ohio-1477, ¶ 22 (violation of a statute that sets forth specific duties constitutes negligence per se). "[W]hile proof that a

defendant violated a statute setting forth specific duties extinguishes the plaintiff's burden to establish the existence of a duty and the breach of that duty, negligence per se does not dispense with a plaintiff's obligation to prove that the defendant's breach was the proximate cause of the injury complained of." *Capella v. Historic Developers, LLC*, 12th Dist. Butler No. CA2017-07-109, 2018-Ohio-546, ¶ 43. After all, "[n]egligence per se and strict liability * * * are not synonymous." *Sikora v. Wenzel*, 88 Ohio St.3d 493, 495 (2000). "Courts generally agree that violation of a statute will not preclude defenses and excuses—i.e., strict liability—unless the statute clearly contemplates such result." *Id.* 496. "[N]egligence per se and strict liability differ in that a negligence per se statutory violation may be 'excused.'" *Id.* at 497.

{¶ 70} The parties are in disagreement over whether expert testimony is necessary to establish the Merandas' negligence and negligence per se claims. However, the supreme court has already answered the question of when expert testimony is needed. "In a negligence action involving conduct within the common knowledge and experience of jurors, expert testimony is not required." *Berdyck v. Shinde*, 66 Ohio St.3d 573, 581 (1993). Conversely, where a negligence action involves the skill and judgment of a licensed professional or relates to information outside the knowledge of a layperson, expert testimony is required. *See id.*; Evid.R. 702.

{¶ 71} To the extent the Merandas seek to establish Martin was negligent in the manner he monitored wind conditions before and during his spray of the herbicides on May 10, 2018, we find that expert testimony regarding the industry standard for monitoring wind conditions was necessary. The actions of professional, licensed commercial applicators in monitoring wind conditions for the application of herbicides is outside the knowledge of lay persons. As the Merandas did not identify an expert qualified to opine on the standard of care owed by a commercial applicator in monitoring wind conditions

for an herbicide spray, we find summary judgment was appropriately entered in appellees' favor on this claim.

{¶ 72} The Merandas seek to establish appellees' negligence for their violation of R.C. 921.24 and various regulations set forth in Ohio Adm.Code 901:5-11-02. R.C. 921.24 provides in pertinent part the following:

> No person shall do any of the following:
>
> (A) Apply, use, directly supervise such application or use, or recommend a pesticide for use inconsistent with the pesticide's labeling, treatment standards, or other restrictions imposed by the director of agriculture.
>
> * * *
>
> (Q) Refuse or fail to comply with this chapter, the rules adopted thereunder, or any unlawful order of the director.

An herbicide is classified as a pesticide pursuant to R.C. 921.01(JJ)(2). *Squires v. Luckey Farmers, Inc.*, 6th Dist. Ottawa No. OT-03-046, 2004-Ohio-4919, ¶ 21, fn. 1.[14]

{¶ 73} Ohio Adm. Code 901:5-11-02 provides as follows:

> (B) No person shall:
>
> Use a pesticide except in accordance with the label which is registered with the Ohio department of agriculture, or in accordance with sections 5, 18, 24(c) of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136-136y (2012) and the rules adopted thereunder.
>
> * * *
>
> (4) Permit any person to mix or load pesticides in an area where the light, whether natural or artificial, is insufficient to read the pesticide label and work in a safe manner.
>
> * * *
>
> (6) Operate equipment for the application of pesticides, including such auxiliary equipment as hoses and metering

---

14. Pursuant to R.C. 921.01(JJ)(2), a "pesticide" is defined as "any substance or mixture of substances intended for * * * [u]se as a plant regulator, defoliant, or desiccant."

- 35 -

devices in such conditions or in such a manner as to result in leakage, spillage, dripping, backflow, vapors, or drift.

* * *

(8) Apply pesticide to an area or crop in such a manner or at such a time that adjacent crops, pasture land, water or other areas will be damaged or contaminated.

"The violation of an administrative rule does not constitute negligence per se." *Chambers v. St. Mary's School*, 82 Ohio St.3d 563 (1998), syllabus. "[H]owever, such a violation may be admissible as evidence of negligence." *Id.*

{¶ 74} R.C. 921.24 requires individuals who apply pesticides to use the pesticides consistently with their labeling requirements.[15] For the herbicide Weedar Amine (2,4-D), the label provides that it should not be applied at wind speeds greater than 15 m.p.h. and should only be applied if the "wind direction favors on-target deposition and there are not sensitive areas * * * within 250 feet downwind." The label for Roundup PowerMax instructs users to avoid contact of the herbicide with foliage, green stems, non-woody roots or fruit crops as severe injury or destruction could result. Finally, with respect to Authority XL, the label advises users that drift potential increases with wind speeds of less than 3 m.p.h. or more than 10 m.p.h. and instructs users to "avoid gusty or windless conditions."

{¶ 75} To the extent the Merandas seek to establish that Martin violated R.C. 921.24 by failing to comply with label requirements regarding wind speed and the size of a buffer zone for the herbicides Weedar Amine (2,4-D), Roundup PowerMax, and Authority XL, we find that expert testimony was not necessary. Lay persons are capable of understanding wind speed, wind direction, and the measurement of distance between

---

15. We note that all experts in this case—those produced by the Merandas and those produced by appellees—are in agreement that the "label is the law" with respect to application of the herbicides.

the area sprayed with herbicide and crops planted in proximity to the area sprayed. Expert testimony is not required to determine whether Martin sprayed the herbicides within 250 feet of the grapevines and in weather conditions where the wind exceeded 15 m.p.h. and had strong gusts. However, because lay persons lack knowledge about the types of damages that are caused by herbicide drift—including the immediate physical damages attributable to herbicide drift and the long-term effect herbicide drift has on grapevines—expert testimony is necessary to establish the proximate cause and damages elements of the Merandas' negligence per se claim.

{¶ 76} Having reviewed the evidence submitted in support and opposition to appellees' motion for summary judgment, we find that the trial court erred in entering summary judgment in favor of appellees on the Merandas' negligence per se claim. The Merandas introduced evidence establishing that genuine issues of material fact exist as to every element of their negligence per se claim.

{¶ 77} First, regarding the duty and breach elements—which are satisfied if the Merandas can show a violation of R.C. 921.24—the Merandas introduced evidence creating an issue of fact as to whether Martin violated herbicide labels by spraying Weed Amine 2,4-D within 250 feet of the grapevines when wind conditions were blowing out of the west or west-by-northwest and towards Seth's property where the grapevines were planted. Issues of fact also exist as to whether the Weedar Amine 2,4-D and Authority XL were sprayed in gusty wind conditions or in wind conditions in excess of their label requirements. The May 10, 2018 Spray Order form completed by Martin indicated that the wind speed was 15 m.p.h. from the west. NOAA weather data from the closest nearby airport weather station indicated that wind conditions at the time the spray occurred ranged from 11 m.p.h. to 16 m.p.h., with gusts between 22 m.p.h. and 24 m.p.h. When deposed, Martin acknowledged that as he was spraying the Bulow soybean field on May

10, 2018, it was "breezy," "a little gusty," and he could tell the chemicals he was spraying were "starting to move a little bit." Seth also acknowledged he was unsure how big the buffer zone was between the Bulow soybean field and the Block D grapes on Seth's property. He estimated "over 150 feet" but admitted he was not "a hundred percent accurate" on whether there was 250 feet between the soybean field and Block D grapes. A map prepared by the ODA indicated that at the narrowest point, the buffer zone provided only 114 feet of separation. Appellees' expert, William W. Witt, indicated the herbicides had been "applied less than 250 feet from a small portion of [the Merandas'] vines toward the Northwest portion of what is referenced as the D block."

{¶ 78} The Merandas have also presented expert opinions from Pavlis and Mathers that conflict with expert opinions offered by appellees' experts, Witt and Doyle, as to the cause and degree of damages the grapevines sustained. Both Mathers and Pavlis opined that the grapevines, especially those located in Block D closest to the Bulow soybean field, sustained significant damage from herbicide drift from Martin's May 10, 2018 application, with Pavlis claiming, "this is the worst 2,4-D damage [he] has ever seen." Pavlis opined that the effects of 2,4-D damage to grapevines can last for multiple years, and Mathers' agreed, noting that 2,4-D damage can last "up to three years." The herbicide damage affected both the quantity and quality of the grapes that would grow. The damage to the grapevines was so severe that Mathers recommend some of the grapevines be ripped out and replanted and Pavlis opined that "all the vineyards should be ripped out and replanted due to the fact that I do not believe the majority of the grape plants will ever fully recover and the fact that many plants are also dead." Pavlis indicated he reviewed the "economic analysis of numerous publications on the establishment of vineyards as well as add[ed] in [his] years of experience * * * [to] come to the conclusion that the cost of re-establishment of the 11 acres of vineyard" that needs to be replaced

would "come to a cost of $25,817/acre." He noted that "this does not include the loss of the crop during the re-establishment years. No crop is harvested during the prep year, year one or year two. In addition, it does not include the cost of the wine which would have been made from the grape which would have been harvested in those years."[16]

{¶ 79} Appellees' experts disagreed with the Merandas' experts about the extent and cause of damage to the grapevines. Though appellees' experts conceded there was "some minimal damage to Block D" (Doyle) or that "some portions of the vines in Blocks C and D on [the Merandas'] property may have sustained some injury in 2018, potentially from herbicide drift and possibly from 2,4-D and/or Glyphosate" (Witt), the experts indicated the damages could have been caused by the Merandas' mismanagement of the vineyard or other herbicide applications. Witt opined in his April 1, 2021 report that "visual evidence suggests that Block C showed no damage in 2019 and Block D showed only minor residual injury, if any, although much improved from the 2018 growing season. Also, it is worth noting that there can be many other reasons for reduced growth/yield of [the Merandas'] grapes which have not and cannot be ruled out such as other herbicide applications, weather conditions, weeds, poor maintenance, etc." Witt further opined that "there is no evidence of any long-lasting, permanent or irreversible damage to any of [the Merandas'] vines based on any drift exposure from Kyle Martin's applications on May 10/11, 2018." He stated there was "no visible evidence available of any vine/grape damage" to the Merandas' property during the 2020 growing season and as support for

___

16. Appellees seek to discredit Pavlis' expert opinion, contending Pavlis' misunderstanding about who owned the Bulow soybean field and who asked for a burndown of the field tainted the reliability of his opinion. Pavlis indicated during his deposition testimony that he believed Cherry Fork owned the soybean field and that it made the decision to burndown the field using 2,4-D. While the soybean field was owned by Bulow and crop-shared by Seth, and it was Seth who requested a burndown of the field, there remains an outstanding factual issue as to who made the decision for Weedar Amine (2,4-D) to be used on the field. Pavlis operated on the understanding that Cherry Fork made the decision to use the herbicide for the burndown.

that finding, cited to the winery's social media posts from 2020 which had photographs of new growth and abundant healthy grape bunches. However, deposition testimony from Seth and Maura indicated that the photographs used on the winery's social media posts may have been taken years earlier, prior to the May 10, 2018 spray.

{¶ 80} In August 2021, Witt visited the Merandas' vineyard and took samples of grape specimens from Blocks C and D. He issued a report on January 25, 2022 opining that "grape plants appeared to be growing normally and any impact from the 2018 event was not evident." Witt observed leaf malformation, which symptoms included neurotic spots, galls on leaves, and malformed leaves. Though the lab that tested the leaves could not determine what caused the leaves foliar distortion, the lab indicated it could have been caused by environmental factors, exposure to certain growth regulator chemicals, or the grapevine fanleaf virus. Witt indicated his belief that the leave malformations were "more likely caused by the grapevine fanleaf virus" than 2,4-D since "no 2,4-D was applied on the vineyard or near the vineyard in 2020 to [his] knowledge." He did not expound on whether the leaves could be malformed as a result of exposure from 2,4-D sprayed in 2018.

{¶ 81} Doyle suggested the damage caused to the Merandas' vineyard was caused through the Merandas' own improper applications of herbicides during 2016 and 2017. He stated, "[t]he [Merandas'] spray records suggest chemicals were often applied to their vines in a manner that was inappropriate and/or off-label. It should be noted that the improper application of herbicides in the vineyard in 2016 or 2017 may not appear as injury to the vines until 2018." From his examination of photographs of the Merandas' vineyard taken in 2021, he observed "a host of problems in the vineyard that appear to be unrelated to 2,4-D and/or glyphosate," and identified a number of diseases that could be responsible for the damage to the grapevines, such as downy mildew, Leaf Roll Virus,

Phomopsis, Eutypa Dieback, and North American Grapevine Yellows. He also indicated that the vineyard "show[ed] a tremendous amount of weed pressure, which will weaken vines and can cause long term damage. Vineyards can also have inherent damage from spring frost, winter cold, or even hail. The damage from any of these events can damage vines or cause death."

{¶ 82} Neither Witt nor Doyle observed any long-lasting or permanent 2,4-D damage at the Merandas' vineyard and both opined that there was no evidence to suggest that the Merandas' vines needed to be replaced or replanted as a result of drift exposure from Martin's herbicide applications on May 10 or 11, 2018.

{¶ 83} Given the conflicting expert opinion as to the cause and severity of the damage to the Merandas' grapevines, summary judgment on the issue of causation was inappropriate. In entering judgment in favor of appellees and concluding that "there was lack of evidence as to causation," the trial court appeared to weigh evidence in appellees' favor and to ignore evidence offered by the Merandas. The court found the Merandas' "failed to produce any records of sprays that they themselves completed." While the Merandas' had no written record of the herbicides they personally sprayed, Seth testified that between 2006 and 2017, he sprayed "either Surflan, Prowl, and Roundup or Glyphosate on those, Roundup brand. That would have been maybe Chateau also." He indicated he applied herbicides "pre-budbreak" and in accordance with the herbicide labels. He later indicated that prior to 2018, he used Roundup after budbreak. Seth produced a written fungicide spray program that he testified he "pretty much" follows each year. (Exhibit 15 to Seth's deposition testimony.) The trial court improperly disregarded Exhibit 15 and Seth's testimony about his fungicide and herbicide sprays in concluding the Merandas' had "failed to produce any records of sprays that they themselves completed."

{¶ 84} The trial court further found there was a "lack of evidence as to causation" because "adjacent property owners applied chemicals to their crops in the days between the date of the alleged incident, May 10, 2018 and the time [the Merandas] reported any damage to the ODA on June 14, 2018." The only evidence offered by appellees indicating that adjacent property owners Jerome Meranda and Joshua Fussnecker conducted chemical sprays of their respective properties prior to Seth contacting the ODA to report drift damage was derived from the ODA's inadmissible June 28, 2018 Case Investigation Report. For the reasons discussed above, we will not consider such evidence.[17]

{¶ 85} However, even if we were to consider the information set forth in the ODA's June 28, 2018 Case Investigation report about Jerome Meranda's and Joshua Fussnecker's herbicide sprays, we find that it does not preclude the Merandas from demonstrating that appellees' earlier application, the May 10, 2018 herbicide application, caused damages. Deposition testimony from Seth indicated that (1) he first noticed herbicide damage on May 11, 2018 when giving a customer a tour of the vineyard, (2) he contacted Cherry Fork about the damage and to request information on what herbicides had been used shortly after noticing the damage, and (3) ODA director Daniels discussed the spray damage with Seth on May 29, 2018 after touring Blocks C and D. These events occurred before Fussnecker and Jerome Meranda completed their herbicide applications, and provide some support for the Merandas' claim that it was Martin's herbicide application that caused the damage to their grapevines. Accordingly, we find that whether appellees' May 10, 2018 herbicide spray, the subsequent herbicide applications of neighboring farms, or the Merandas' own actions in the management of the vineyard, or

_____

17. Seth was asked about Jerome Meranda's and Joshua Fussnecker's respective herbicide sprays during his deposition testimony. Seth did not have personal knowledge of the sprays, but indicated that if Fussnecker and Jerome had admitted to spraying herbicides on June 3, 2018 and June 8, 2018, respectively, he would accept that as true.

- 42 -

a combination of these things, caused damage to the Merandas' grapevines is an issue of fact that cannot be decided on summary judgment.

{¶ 86} We further find, contrary to appellees' assertions, that the doctrines of primary assumption of the risk and implied assumption of the risk do not apply to bar the Merandas' negligence per se claim or their other negligence-based claims.

{¶ 87} "Assumption of [the] risk is a measure of the defendant's duty of care." *Bennett v. Biernacki*, 12th Dist. Warren No. CA2022-05-030, 2022-Ohio-4449, ¶ 12. "[P]rimary assumption of [the] risk, when applicable, prevents a plaintiff from establishing the duty element of a negligence case and so entitles a defendant to judgment as a matter of law." *Gallagher v. Cleveland Brown Football Co.*, 74 Ohio St.3d 427, 433 (1996). *See also Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 18 ("Primary assumption of the risk means that a defendant owes no duty whatsoever to the plaintiff"). The primary-assumption-of-the-risk doctrine "rests on the fiction that [the] plaintiff has tacitly consented to the risk, thereby relieving defendant of any duty owed to him." *Collier v. Northland Swim Club*, 35 Ohio App.3d 35, 37 (10th Dist.1987). "[O]nly those risks directly associated with the activity in question are within the scope of primary assumption of [the] risk." *Gallagher* at 432. "'To be covered under the [primary-assumption-of-the-risk] doctrine, the risk must be one that is so inherent to the * * * activity that it cannot be eliminated.'" *Horvath* at ¶ 19, quoting *Konesky v. Wood Cty. Agriculture Soc.*, 164 Ohio App.3d 839, 2005-Ohio-7009, ¶ 19 (6th Dist.). "Where the risk at issue is not inherent, then a negligence standard applies." *Id.*

{¶ 88} "In contrast, implied assumption of [the] risk occurs when a person consented to, or acquiesced in an appreciated or known risk." *French v. New Paris*, 12th Dist. Preble No. CA2010-05-008, 2011-Ohio-1309, ¶ 34. The defense of implied assumption of the risk has been merged with the defense of contributory negligence and

does not operate as a complete bar to recovery. *Id.*, citing *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. Franklin No. 07AP-696, 2008-Ohio-1421, ¶ 11. *See also Anderson v. Ceccardi*, 6 Ohio St.3d 110, 113 (1983). "Under an implied assumption of the risk analysis, some duty is found to exist on the part of the defendant and a court is permitted to utilize comparative fault principles to determine what, if any, recovery to which the plaintiff may be entitled." *French* at ¶ 34. Where there are "attendant circumstances that raise questions of fact [about] whether an injured party assumed the risk in a particular situation * * * the doctrine of implied assumption of [the] risk, not primary assumption of [the] risk would be applicable." *Gallagher*, 74 Ohio St.3d at 432.

{¶ 89} Appellees argue primary assumption of the risk applies because Seth requested a burndown of the soybean field despite having "full knowledge of the danger of burning down the soybean field 'directly behind' his grapevines," he requested that the specific herbicides Weedar Amine (2,4-D), Roundup PowerMax, and Authority XL be used, he asked for the spray to occur after budbreak, when his grapevines were more susceptible to damage, and he gave the approval for the spray to occur on May 10, 2018 after speaking with Michelle about the wind conditions. They further argue that herbicide drift is inherent in every herbicide application and point to statements from Seth, Pavlis, and Witt in support of this claim.

{¶ 90} When deposed, Seth acknowledged that when herbicides are sprayed outside, there is a risk of drift because of wind. Pavlis acknowledged that with respect to 2-4,D, there is a risk of drift, even when there is no wind. Finally, Witt stated in his April 1, 2021 report that "[h]erbicide drift is an inherent and often unavoidable risk to herbicide spray applications and can occur under a wide variety of circumstances." Witt did not expound on the circumstances where herbicide drift can be avoided or the circumstances where drift was more likely to occur in his report. Likewise, when deposed, Pavlis was

not asked to expound on his acknowledgement that 2,4-D can drift with no wind, though he seemed to suggest a higher temperature played a part in whether 2,4-D drifts.[18]

{¶ 91} We find that the present case presents a situation where the doctrine of implied assumption of the risk, not primary assumption of the risk is applicable. The risks related to the use of herbicides can be eliminated through compliance with the individual herbicide labels dictating how and in what conditions the products may safely be applied.[19]

{¶ 92} Appellees' arguments that the Merandas assumed the risk of herbicide drift relate to an implied assumption of the risk defense. Appellees suggest that the Merandas

18. The following is relevant portion of Pavlis deposition testimony where he acknowledged that 2,4-D can drift in windless conditions:

> Q: Right. So, for example, if you were asked by another client or consultant, you know, someone you consult with, should I spray 2,4-D in close proximity to my vineyards for purposes of growing another crop, you would probably say, "No, that's not a very wise idea?"
>
> [Pavlis]: Correct
>
> Q: Because there's a risk of drift, which is well known?
>
> [Pavlis]: Correct.
>
> Q: Do you know that 2,4-D can drift when there's no wind at all? Are you aware of that?
>
> [Pavlis]: That's true.
>
> Q: Is it more likely to drift with no wind or heavy wind, if you know?
>
> [Pavlis]: Definitely with wind. Definitely with higher temperatures, yeah, uh-huh.

19. In rejecting appellees' contention that primary assumption of the risk applies, we also reject the notion that the present case is comparable to the scenario in *Marcum v. Colonial Ins. Co.*, 10th Dist. Franklin No. 02AP-917, 2003-Ohio-4369. In *Marcum*, the plaintiff, the mother of a man killed in an illegal street race, sued the individual her son was racing after the defendant's vehicle struck plaintiff's son's vehicle near the conclusion of the race. The Tenth District found that the plaintiff could not prevail on her negligence per se claim alleging defendant violated R.C. 4511.21(A), the assured clear distance statute, because the doctrine of primary assumption of the risk applied. *Id.* at ¶ 39-40. There, the court found that no duty was owed by the defendant to the plaintiff's son as both drivers "willingly agreed to participate in a street race and the subsequent high-speed race on a public road was inherently dangerous." *Id.* at ¶ 40. Unlike an illegal street race, there is nothing inherently dangerous in hiring a licensed commercial applicator to apply herbicides to a soybean field.

consented to, or acquiesced in an appreciated or known risk of herbicide drift as Seth asked for an herbicide application of the Bulow soybean field after budbreak had occurred of the grapevines. In the present case, factual questions exist as to whether Seth asked for the specific herbicides Weedar Amine (2,4-D), Authority XL, and Roundup PowerMax to be used in the burndown of the soybean field and whether he was informed of the wind conditions on May 10, 2018 prior to telling Michelle that Cherry Fork should move forward with the spray as "it's getting late enough, I need it sprayed." If a juror were to find that Seth did request that those specific herbicides be used or find Seth requested that the spray occur after being specifically advised of gusty wind conditions and wind blowing out of the west or west-by-northwest and towards his home farm, comparative fault principles could then be used to determine what recovery, if any, the Merandas were entitled to receive. *See French*, 2011-Ohio-1309 at ¶ 34. However, because implied assumption of the risk involves comparative fault principles and questions of fact remain, summary judgment based on implied assumption of the risk is not appropriate. *See, e.g., Oliveri v. Osteostrong*, 11th Dist. Lake No. 2009-L-104, 2021-Ohio-1694, ¶ 37 (finding summary judgment based on implied assumption of the risk was not warranted were questions of fact remained); *Davis v. Dungeons of Delhi*, 1st Dist. Hamilton No. C-180242, 2019-Ohio-1457, ¶ 41 ("Implied assumption of the risk invokes factual questions that are generally to be resolved by a jury and not by summary judgment").

{¶ 93} Accordingly, as the doctrine of primary assumption of the risk does not apply in the present case and as the Merandas introduced evidence demonstrating issues of fact remain on their negligence per se claim, we find that the trial court erred in granting appellees' summary judgment on this cause of action.

## 2. Trespass Claim

{¶ 94} The Merandas argue that the trial court erred in granting appellees

summary judgment on their trespass claim. They contend a chemical invasion of real property is actionable as an indirect trespass and in support of their claim cite to *Williams v. Oeder*, 103 Ohio App.3d 333 (12th Dist.1995).

{¶ 95} "'A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue.'" *Apel v. Katz*, 83 Ohio St.3d 11, 19 (1998), quoting *Linley v. DeMoss*, 83 Ohio App.3d 594, 598 (10th Dist.1992). *See also Chance v. BP Chemicals, Inc.*, 77 Ohio St.3d 17, 24 (1996) ("Trespass is an unlawful entry upon the property of another"). Generally, to bring a trespass claim, "a property owner must prove two essential elements: (1) an unauthorized intentional act, and (2) an intrusion that interferes with the owner's right of exclusive possession of [his or] her property." *Estes v. Robbins Lumber, LLC*, 12th Dist. Clermont No. CA2016-02-011, 2016-Ohio-8231, ¶ 16. A landowner who has shown a tangible invasion of property is entitled to at least recover nominal damages. *Oeder* at 339; *Olive Oil, L.L.C. v. Cleveland Elec. Illum. Co.*, 8th Dist. Cuyahoga No. 109553, 2021-Ohio-2309, ¶ 13. Actual damages may be recovered if the plaintiff proves the trespass proximately caused the damages for which compensation is sought and the amount of those damages. *Id.*

{¶ 96} In addition to direct trespass, Ohio recognizes claims of indirect trespass, which are brought when a defendant's actions causes a substance to intrude on the plaintiff's land and the substance causes substantial damages. *See, e.g., Chance*, 77 Ohio St.3d at 27 (recognizing a cause of action for indirect trespass but finding that plaintiffs'-landowners' claim relating to underground migrating injectate from a chemical refining plant was too speculative as "some type of physical damages or interference must be shown in an indirect invasion situation such as this"); *Oeder* at 338-339 (indirect trespass cause of action for airborne particulates); *Brown v. Scioto Cty. Bd. of Commrs.*,

87 Ohio App.3d 704, 716-717 (4th Dist.1993) (indirect trespass claim for particulate matters that invade a landowner's property); *Hager v. Waste Tech. Indus.*, 7th Dist. Columbiana No. 2000-CO-45, 2002-Ohio-3466, ¶ 39-58 (indirect trespass cause of action for harm allegedly caused by hazardous waste storage and incineration); *Colegrove v. Fred A. Nemann Co.*, 1st Dist. Hamilton No. C-140171, 2015-Ohio-533 (indirect trespass cause of action for construction vibrations); *Lueke v. Union Oil Co.*, 6th Dist. Ottawa No. OT-00-008, 2000 Ohio App. LEXIS 4845 (Oct. 20, 2000) (indirect trespass cause of action for underground gasoline storage tanks that purportedly leaked into plaintiff's water well); *Hayes v. Carrigan*, 1st Dist. Hamilton Nos. C-160554, C-160630 and C-160641, 2017-Ohio-5867, ¶ 26 (indirect trespass cause of action premised upon invading weed killer): *Timbuk Farms, Inc. v. Hortica Ins. & Emp. Benefits*, 5th Dist. Licking No. 2021 CA 00017, 2021-Ohio-4141, ¶ 58 (recognizing an indirect trespass cause of action requires substantial damages to be shown).

{¶ 97} As early as 1995, this court recognized that "the invasion of airborne particulates may interfere with a complainant's interest in exclusive possession and may therefore constitute a trespass." *Oeder*, 103 Ohio App.3d at 338. *Oeder* involved an indirect trespass claim made by plaintiffs-landowners who claimed dust and dirt from the defendants' sand and gravel processing facility, asphalt plant, and concrete plant had invaded and interfered with the use of their property. In *Oeder* we expressly approved and adopted the following elements for indirect trespass caused by airborne pollutants: "'a plaintiff must show (1) an invasion affecting an interest in the exclusive possession of his property; (2) an intentional doing of the act which results in the invasion; (3) a reasonable foreseeability that the act done could result in an invasion of the plaintiff's possessory interest; and (4) *substantial damages* to the res.'" (Emphasis sic.) *Oeder* at 339, quoting *Borland v. Sanders Lead Co., Inc.*, 369 So.2d 523 (Ala.1979). The Fourth

District in *Brown*, 87 Ohio App.3d at 717, and the Seventh District in *Hager*, 2022-Ohio-3466 at ¶ 39, likewise identified and applied the foregoing elements to indirect trespass claims. We find that the elements identified in *Oeder* apply to the Merandas' trespass claim as they have asserted that herbicides from appellees' May 10, 2018 herbicide application drifted onto their property and damaged their grapevines.[20]

{¶ 98} Utilizing the *Oeder* elements, we find that appellees failed to meet their burden under Civ.R. 56(C) of demonstrating that no genuine issue of material fact existed and that they were entitled to judgment as a matter of law on the indirect trespass claim. The Merandas introduced evidence creating issues of fact as to whether Martin intentionally applied the Weedar Amine 2,4D, Authority XL and, Roundup PowerMax herbicide mixture with knowledge of the wind conditions and the proximity of the neighboring grapevines. According to Michelle Miranda, Martin had called her to express concerns about the wind conditions before starting his spray of the Bulow soybean field on May 10, 2018. NOAA weather data and Martin's May 10, 2018 Spray Order form

---

20. **{¶a}** Appellees argue this court should apply *Robinson v. Cameron*, 12th Dist. Butler No. CA2014-09-191, 2015-Ohio-1486, to the Merandas' trespass claim. In *Robinson*, a plaintiff brought a trespass claim against her neighbors for structural damages to her home allegedly caused by water that leaked from the defendants' underground pool. *Id* at ¶ 2-4. The trial court granted summary judgment to the defendants and this court affirmed, finding

> the issue in the case * * * was not whether the [defendants] intentionally built a swimming pool in their backyard with knowledge that water from the pool could enter the [plaintiff's] property. Rather, * * * the issue was whether the [defendants] intended to bring about the exact result, namely for the pool water to infiltrate [plaintiff's] property and home, by building their pool, or whether they believed it to be substantially certain that building the pool would cause that result.

*Id.* at ¶ 13. Analogizing the present case to *Robinson*, appellees contend they are entitled to judgment as the Merandas cannot demonstrate appellees intended for the herbicides to infiltrate the Merandas' grapevines during Martin's chemical application of the neighboring soybean field.

**{¶b}** We find *Robinson* inapplicable to the case at hand. In *Robinson*, the parties did not argue and we did not address an indirect trespass cause of action. In contrast, in the present case, the Merandas pled in their complaint and argued in their memorandum in opposition to summary judgment an indirect trespass cause of action by way of herbicide drift. As the Merandas argued that their grapevines were damaged by "chemicals improperly drifting [from the Bulow soybean field] onto the adjacent vineyard," we find it appropriate to analyze their indirect trespass claim in accordance with the test laid out in *Oeder*.

indicate that the wind was coming out of the west or west-by-northwest and blowing towards Seth's home farm at the time of the herbicide application to the soybean field. The NOAA weather data indicated there were gusts between 22 and 24 m.p.h. at the time of the application. Martin acknowledged during his deposition that the wind had picked up after he began spraying on May 10, 2018 and the chemicals he sprayed had "start[ed] to move a little bit." Despite noticing the increasing wind and the movement of the herbicides, Martin finished spraying the Bulow soybean before shutting down for the day.

{¶ 99} The fact that the chemicals could drift onto, or invade, Seth's property was foreseeable given that the labels for the individual herbicides warned of the risk of drift. Weedar Amine 2,4-D specifically advised that for spray drift management, the product was not to be applied in wind speeds greater than 15 m.p.h. or where there were nontarget crops within 250 feet downwind of the application. Authority XL advised that "[d]rift potential increases at wind speeds * * * of more than 10 mph" and advised users to "avoid gusty or windless conditions." When deposed, Martin acknowledged familiarity with Weedar Amine 2,4-D and Roundup PowerMax labels, and indicated he read the Authority XL label before applying the herbicide on May 10, 2018. As such, Martin was on notice of the risk of the herbicides drifting onto the grapevines located on the neighboring property.

{¶ 100} Whether herbicides from the May 10, 2018 application caused substantial damage to Seth's property is a disputed issue of fact for jury determination. Where the trespass alleged is an indirect trespass, "physical damage or actual interference with the reasonable and foreseeable use of the propert[y] must be demonstrated." *Chance*, 77 Ohio St.3d at 28. Moreover, the damage must be substantial. *Oeder* at 339; *Lueke*, 2000 Ohio App. LEXIS 4845 at *17-18. As discussed above, the Merandas presented evidence by way of Seth's and Maura's deposition testimony, the ODA's Notice of Warning Letter,

and expert opinion as to the cause and severity of the damages sustained to the grapevines. The Merandas testified about the impact the herbicide drift damage has had on their use of the property, with both Seth and Maura indicating that the quality and quantity of grape production in the vineyard had been significantly decreased. The Merandas' experts indicated the damage was significant, or as Pavlis indicated, "the worst 2,4-D damage [he] had ever seen." Pavlis indicated the damage was so extensive that the grapevines had to be ripped out and replaced at a cost of $25,817 per acre.

{¶ 101} Given the evidence presented by the parties as it relates to the Merandas' indirect trespass claim, we find that genuine issues of material fact exist which preclude judgment from being rendered in appellees' favor on this claim. The trial court erred in finding that the Merandas had "no viable" claim for trespass.

### 3. Nuisance Claim

{¶ 102} The trial court found appellees were entitled to summary judgment on the Merandas' private nuisance claim because the Merandas "have failed to put forth any evidence of recklessness on the part of the [appellees]." On appeal, the Merandas argue that "recklessness" was not required for their nuisance claim—negligent conduct sufficed.

{¶ 103} Nuisance is a term used to designate "the wrongful invasion of a legal right or interest." *Brackett v. Moler Raceway Park, L.L.C.*, 195 Ohio App.3d 372, 2011-Ohio-4469, ¶ 15 (12th Dist.). Nuisance may be public, i.e., an unreasonable interference with a right common to the general public, or it may be private. *Brown*, 87 Ohio App.3d at 712. "A 'private nuisance' is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Nithiananthan v. Toirac*, 12th Dist. Warren Nos. CA2014-02-021, CA2014-02-028, and CA2014-08-114, 2015-Ohio-1416, ¶ 32. "In order for a private nuisance to be actionable, the invasion must be either intentional and unreasonable or unintentional but caused by negligent, reckless, or abnormally

dangerous conduct." *Id.* Additionally, the "injury must be real, material, and substantial." *Banford v. Aldrich Chem. Co.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 17.

{¶ 104} While we agree with the Merandas that a private nuisance claim may be brought when there has been an unintentional invasion caused by *negligent* conduct, we nonetheless find that the trial court did not err in entering summary judgment in appellees favor. As set forth above, a private nuisance involves a *nontrespassory invasion*. *Nithiananthan* at ¶ 32. The facts of this case indicate a trespassory invasion of chemicals onto Seth's property. As such, nuisance is not a viable theory of recovery for the Merandas' property damage.

{¶ 105} We recognize that there are some instances when a nuisance claim and an indirect trespass claim may be simultaneously pursued. Consider, for instance, the situation identified in *Brown*:

> "For example, if the smoke or polluting substance emitting from a defendant's operation causes discomfort and annoyance to the plaintiff in his use and enjoyment of the property, then the plaintiff's remedy is for nuisance; but if, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the res, then the plaintiff may seek his remedy in trespass, though his alternative remedy in nuisance may co-exist."

*Brown* at 717, quoting *Borland*, 369 So.2d at 530. The present case, however, is not one of those situations where a nontrespassory invasion interfered with Merandas use and enjoyment of their property. Accordingly, we find that summary judgment was properly entered in appellees' favor on the private nuisance claim, albeit on different grounds.

### 4. Negligent Hiring, Supervision, and Training Claim

{¶ 106} The Merandas dedicated three sentences in the argument section of their appellate brief to their claim that summary judgment was improperly entered in appellees'

favor on their negligent hiring, supervision, and training claim. They contend that they "presented substantial evidence that Cherry Fork failed to properly hire, supervise and/or train both Michelle and Martin. Additionally, the Merandas presented substantial evidence that such negligence caused their damages. Accordingly, this claim was not a proper subject of summary judgment."

{¶ 107} The Merandas failed to develop any argument concerning their negligent hiring, supervision, or training claim in their appellate brief. App.R. 16(A)(7) provides that an appellant's brief shall include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Where a party "fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required by App.R. 16(A)," an appellate court may disregard the assigned error. See App.R. 12(A)(2). As the Merandas failed to comply with App.R. 16(A)(7) with respect to their negligent hiring, supervision, and training claim, we disregard their assignment of error as it relates to this claim.

### 5. Punitive Damages

{¶ 108} The trial court entered judgment in favor of appellees on the Merandas' claim for punitive damages, finding "[the Merandas] offered no evidence of actual malice." The Merandas' dispute this finding, arguing they presented evidence showing Martin acted with a conscious disregard for the safety of their grapevines by knowing of the windy weather conditions and deciding to spray anyways.

{¶ 109} "In Ohio, an award of punitive damages is available only upon a finding of actual malice." *Whitson v. One Stop Rental Tool & Party*, 12th Dist. Preble No. CA2016-03-004, 2017-Ohio-418, ¶ 26, citing *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio

St.3d 470, 473 (1991). "Actual malice for these purposes is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirt of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Id.*, citing *Preston v. Murty*, 32 Ohio St.3d 334, 335 (1987). "[S]omething more than mere negligence is always required before an award of punitive damages may be made." *Id.* "A possibility or even probability of harm is not enough as that requirement would place the act in the realm of negligence." *Id.*, citing *Murty* at 336. "[B]efore submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm." *Murty* at 336. "Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." *Id.*

{¶ 110} Appellees argued they were entitled to summary judgment on the issue of punitive damages because the Merandas could not present any evidence demonstrating Martin acted with actual malice in applying the herbicides on May 10, 2018. Appellees contend Michelle's and Martin's deposition testimony shows affirmative actions were taken to prevent herbicide drift to the Merandas' grapevines. Michelle and Martin indicated that they delayed in spraying the Bulow soybean field until May 10, 2018 due, in part, to prior bad weather conditions. On the day of the spray, Heno D, a wind control and anti-foaming agent was used to help prevent drifting. Further, Martin's deposition testimony indicated that while spraying the Bulow soybean field on May 10, 2018, he visually monitored wind conditions and made the decision to stop any further sprays once he observed wind speeds were increasing.

{¶ 111} We find, contrary to the appellees' arguments, that the Merandas did present some evidence creating an issue of fact as to whether Martin acted with actual

malice in his May 10, 2018 herbicide application to the soybean field. Specifically, we find that Martin's deposition testimony about his actions in finishing the spray of the soybean field (before stopping for the day) *after* observing that the wind had picked up and the chemicals had "start[ed] to move a little bit" creates an issue of fact as to whether he acted with a conscious disregard for the safety of the Merandas' grapevines. Martin's deposition testimony indicates he knew the proximity of the grapevines to the soybean field, knew from his own experiences and from reading the herbicide-product labels about the dangers of herbicide drift, and knew that the chemicals were "starting to move" due to the increase in the wind. Nonetheless, Martin continued his herbicide application of the soybean field until the field was finished.[21] Only then did he stop spraying for the day. We find this evidence was sufficient to create a genuine triable issue as to whether Martin acted with actual malice thereby entitling the Merandas' to punitive damages. We therefore reverse the trial court's award of summary judgment to appellees on the issue of punitive damages.

### 6. Treble Damages

{¶ 112} As explained in *Denoyer v. Lamb*, 22 Ohio App.3d 136, 138 (1st Dist.1984),

> in an action for compensatory damages for cutting, destroying and damaging trees and other growth, and for related damage to the land, when the owner intends to use the property for a residence or for recreation or both, according to his personal tastes and wishes, the owner is not limited to the diminution in value (difference in value of the whole property before and after the damage) or to the stumpage or other commercial value of the timber. He may recover as damages the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible,

---

21. Martin indicated he was unsure how far into his application of the soybean field he was when he noticed the chemicals were "starting to move a little bit." Whether he was just getting started, halfway through the field, nearly complete, or at some other point in his herbicide application is an outstanding issue of fact.

without requiring grossly disproportionate expenditures and
with allowance for the natural processes of regeneration
within a reasonable period of time.

*Accord Collins v. Messer*, 12th Dist. Butler No. CA2003-06-149, 2004-Ohio-3007, ¶ 16;

*Colegrove*, 2015-Ohio-533 at ¶ 35.

{¶ 113} In addition to compensatory and punitive damages, the Merandas seek treble damages pursuant to R.C. 901.51. Pursuant to this statute, "[n]o person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land. * * * [W]however violates this section is liable in treble damages for the injury caused." "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." *Collins* at ¶ 11, citing R.C. 2901.22(C). *See also Wooten v. Knisley*, 79 Ohio St.3d 282, 289-290 (1997) ("the term 'recklessly' as it is used in R.C. 901.51 is defined in R.C. 2901.22[C]").

{¶ 114} In the case before us, the Merandas have presented summary judgment evidence creating an issue of fact as to whether appellees acted recklessly in conducting the May 10, 2018 herbicide spray. Issues of fact exist as to whether appellees selected the specific herbicides to be used for the burndown of the soybean field, which Martin knew was less than 250 feet away from the grapevines and was downwind of his herbicide application. Issues of fact also exist as to whether Martin perversely disregarded a known risk of destruction or damage to the grapevines by continuing to spray the soybean field after noticing that the winds had picked up and the chemicals had "start[ed] to move a little bit." As a genuine triable issue exists as to whether Martin recklessly injured and

destroyed the Merandas' grapevines, we find that the trial court erred in granting summary judgment to appellees on the Merandas' request for treble damages under R.C. 901.51.

## IV. CONCLUSION

{¶ 115} We hereby sustain the Merandas' sole assignment of error in part and overrule it in part. To the extent that the trial court entered judgment in appellees' favor on the common-law negligence claim, nuisance claim, and the negligent hiring, supervising, and training claim, we affirm the trial court's decision. However, we find that the trial court improperly disregarded some Civ.R. 56 evidence, ignored issues of fact, and weighed conflicting evidence in granting summary judgment in appellees' favor on the Merandas' claims for negligence per se, indirect trespass, punitive damages, and treble damages. We therefore reverse the trial court's decision as it relates to those claims and remand the matter for further proceedings.

{¶ 116} Judgment affirmed in part, reversed in part and the matter remanded for further proceedings.

S. POWELL, P.J., and M. POWELL, J., concur.